**STATE of Tennessee**

v.

**Marlon Duane KISER.**

Supreme Court of Tennessee,
at Knoxville.

Jan. 6, 2009 Session.

May 13, 2009.

Brock Mehler (at trial and on appeal) and Peter D. Heil (on appeal), Nashville, Tennessee; and Ardena J. Garth, District Public Defender; Karla G. Gothard, Executive Assistant Public Defender; Mary Ann Green, Assistant Public Defender; and Hugh J. Moore, Jr., Howell G. Clements, and Cynthia A. LeCroy–Schemel (all at trial), Chattanooga, Tennessee, for the appellant, Marlon Duane Kiser.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael E. Moore, Solicitor

General; Mark E. Davidson, Senior Counsel; William H. Cox, District Attorney General; and Barry A. Steelman, Assistant District Attorney, for the appellee, State of Tennessee.

## OPINION

CORNELIA A. CLARK, J., delivered the opinion of the court, in which JANICE M. HOLDER, C.J., GARY R. WADE, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

A jury convicted Defendant, Marlon Duane Kiser, of first degree premeditated murder and two counts of first degree felony murder, all involving the same victim, Hamilton County Deputy Sheriff Donald Bond. The jury subsequently sentenced Defendant to death on each count after finding that the murder was committed against a law enforcement officer engaged in the performance of official duties and Defendant knew or reasonably should have known that the victim was a law enforcement officer engaged in the performance of official duties, Tenn.Code Ann. § 39–13–204(i)(9) (Supp.2001), and after finding that the evidence of this aggravating circumstance outweighed the evidence of mitigating circumstances beyond a reasonable doubt. The Court of Criminal Appeals affirmed the convictions and sentence but remanded the matter for the trial court to merge the convictions and enter a single judgment of conviction for first degree murder.

After the case was docketed in this Court on automatic direct appeal, we entered an order identifying several issues for oral argument.[1] We now hold as follows: (1) Defendant's constitutional rights were not violated by his waiver of his right to present mitigating evidence at sentencing; (2) the State did not exercise its peremptory challenges in an impermissibly discriminatory manner; (3) the trial court did not commit reversible error by refusing to instruct the jury on residual doubt; (4) the trial court did not err by limiting Defendant's proof; (5) the trial court did not err by excluding (a) a telephone call from an unidentified caller claiming that Defendant did not commit the murder or (b) a written note whose author was unidentified; (6) the evidence is sufficient to support the verdicts; (7) the death sentence is valid under this Court's mandatory review pursuant to Tennessee Code Annotated section 39–13–206(c)(1) (2006); and (8) Tennessee's lethal injection protocol is constitutional. We agree with the Court of Criminal Appeals' conclusions with respect to the remaining issues and incorporate the relevant portions of its opinion included in the attached appendix.

We affirm the Defendant's convictions and sentence and remand this matter to the trial court for entry of a single judgment of conviction for first degree murder.[2]

### Factual and Procedural History[3]

In the early morning hours of September 6, 2001, Deputy Sheriff Donald Ken-

---

1. "Prior to the setting of oral argument, the Court shall review the record and briefs and consider *all* errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument." Tenn. Sup.Ct. R. 12.2.

2. Tennessee law provides for the merger of multiple convictions of first degree murder involving a single victim. *See State v. Cribbs*, 967 S.W.2d 773, 788 (Tenn.1998) (recogniz-

ing that "when only one person has been murdered, a jury verdict of guilt on more than one count of an indictment charging different means of committing first degree murder will support only one judgment of conviction").

3. A more detailed recitation of the proof adduced in this case is included in the comprehensive and well-written summary of the facts set forth in the Court of Criminal Appeals' opinion, *State v. Kiser*, No. E2005–02406–

neth Bond, Jr., of the Hamilton County Sheriff's Department was shot to death while on duty patrolling the East Brainerd area of Chattanooga. In October 2001, a Hamilton County grand jury indicted Defendant for first degree premeditated murder, first degree felony murder in the perpetration of theft, and first degree felony murder in the perpetration of arson. The trial court ordered a special venire, see Tenn.Code Ann. § 20–4–201(2) (Supp. 2008), and a jury was selected in Davidson County, Tennessee. Trial was held in Hamilton County from November 10–20, 2003. At trial, the State sought to prove that Defendant hated the police and, when confronted by an officer while trying to commit another crime, murdered him. The defense sought to show that Defendant was framed in the murder by his friend and housemate, James Michael Chattin.

### Guilt–Innocence Phase of Trial

The State's proof showed that, in November 2000, Uncle Charlie's Produce, a fruit stand owned by Charles Sims on Brainerd Road about a mile from Chattin's house, burned down under suspicious circumstances. Several weeks before Bond's murder, Defendant and his friends Mike Chattin and Carl Hankins stopped by Sims' rebuilt fruit stand. Defendant remained in Chattin's truck while Chattin and Hankins spoke with Sims, who told them he suspected that a competitor, the owner of Nunley's fruit stand across the street, had burned down his old stand. When Chattin and Hankins returned to the truck and informed Defendant of Sims' suspicions, Defendant remarked, "we ort [sic] to go up there and kick his [Nunley's] produce around a little bit and turn his

tables over and maybe drag him up and down the road." Later that day, Defendant suggested burning Nunley's fruit stand because Defendant thought "an eye for an eye" should apply. According to the State's theory, this encounter caused Defendant to begin planning the arson of the fruit stand.

Defendant had lived with Chattin at Chattin's house on Brainerd Road in Chattanooga until he moved to his girlfriend's house on Gann Road in Hamilton County about six weeks before Bond's murder. On the afternoon of September 5, 2001, after receiving a telephone call from Chattin, Defendant left his girlfriend's house with his MAK–90 semiautomatic assault rifle and a backpack. That evening Defendant, Hankins, and Murphy Cantrelle, another of Chattin's friends, were at Chattin's house. Cantrelle and Hankins left at about 10 to 11 p.m., near the time that Chattin and his girlfriend, Carol Bishop, arrived. Before Hankins departed, Defendant told him that it was time for him to leave, "that there was either things going on or things [Hankins] didn't need to be a part of, that it would be better off if [Hankins] just left." When Chattin and Bishop went to bed around 11:30 p.m., Defendant was still at Chattin's house.

Around 1:30 a.m. on September 6, 2001, Nola Rannigan, who lived in the house next to Nunley's produce stand, noticed a car in the parking lot with its lights on. She later heard "a big bam and then ... several bams after that and then a couple pops." Rannigan looked out the window and saw that the car was still there. About five or seven minutes later she saw a truck with its lights off pull out of the parking lot and slowly proceed west on Brainerd Road. Rannigan saw only one person, the

driver, in the truck. When the driver straightened himself up, she could tell that he was "a fairly big man, at least six f[ee]t."

That same morning Deputy Bond was patrolling the East Brainerd Road area in his marked patrol car. When he did not respond to calls from the dispatcher, officers began looking for him. At about 2:30 a.m., Officer Kevin Floyd of the Hamilton County Sheriff's Department found Deputy Bond's body lying in the parking lot at Nunley's fruit stand. Deputy Bond had suffered multiple severe gunshot wounds, seven inflicted with a high-powered large caliber weapon. Two other wounds were consistent with a .40 caliber Glock pistol. The wounds were spread over the victim's body from his mouth and neck to his arms, abdomen, thigh, and knee. The gunshot wound in the victim's mouth occurred while the victim's mouth was partially open, rupturing the victim's lips, and exited the base of the victim's skull. Bond's shirt was open, and the front part of his bulletproof vest and his .40 caliber Glock service weapon were missing. There was no blood on the front of Deputy Bond's shirt in the area where his bulletproof vest would have been, but blood was present on the back panel of the vest. Bond's patrol car was still on the lot, running and with its lights on. Another vehicle, a black Ford truck, was also parked at Nunley's.[4] Investigating officers noticed the odor of kerosene or gasoline around the produce stand and a greasy film on the Ford's windshield, its hood, the truck's passenger side, and the nearby ground. Analysis of a soil sample taken from underneath the passenger door of the truck revealed the presence of gasoline. Prints from a size 13 shoe were discovered behind the truck.

Investigators also found shell casings, cartridge casings, and bullets on the ground at the fruit stand.

Around 4 a.m. Mike Chattin approached a Chattanooga police officer at a convenience store and told him, "My buddy just killed a policeman." Chattin was "extremely upset, shaking all over, [and] trembling." Based on Chattin's information about Defendant, a SWAT team was sent to Chattin's house around 5 o'clock that morning. SWAT team members took positions from which they could observe the back of the house. At least three team members saw Defendant walk out of the house onto the deck and drop several objects off of the deck. About ten or twenty minutes later Defendant came out of the basement and approached his car, where SWAT team members apprehended him. When the officers attempted to handcuff him, Defendant tried to grab an officer's gun, and a fight broke out between Defendant and SWAT team members. Defendant was eventually subdued and taken to the hospital for treatment of injuries suffered during his arrest.

A search of the area below the deck, where the SWAT team members had seen Defendant throw the objects, yielded the front half of Deputy Bond's bulletproof vest and his .40 caliber Glock pistol as well as black sweat pants, a black hooded sweatshirt with a camouflage cape attached by fishing line, a black T-shirt, and a size 13 boot. Inside the open doorway to the basement, officers found Defendant's MAK–90 rifle with two magazines. The gun was ready to fire. In the basement the officers also recovered a backpack and other items, including a cellphone. In the backpack they found a spool of fishing line, another magazine of ammunition, and box-

---

4. The Ford truck belonged to a trucker, who had left it parked at the fruit stand while he was on a trip.

es of Wolf ammunition. A bullet hole was discovered on the passenger's side of Chattin's Dodge truck, which was parked at the house. A substance appearing to be blood was observed on the exterior passenger side, the windshield, and the hood of the vehicle.

Forensic testing revealed that nine of the shell casings found at Nunley's stand and bullet fragments recovered from the victim's body had been fired from Defendant's gun. Other casings found at Nunley's produce stand had come from the victim's gun. Gunshot residue was found on Defendant's hands in an amount sufficient to conclude that he had shot a gun. Particles on the sweat pants and sweatshirt found near the deck were consistent with gunshot primer residue. The partial shoe tracks near the Ford truck at the scene were consistent in size, shape and tread design with the sole of the left boot discovered under the deck. Microscopic examination of fibers obtained by vacuuming the victim's patrol car and fibers from the burlap sewn onto the sweatshirt showed that the two were consistent with one another. Fibers microscopically similar to fibers from the sweat pants and T-shirt were found on the interior driver's side of the victim's car. Hairs on the T-shirt, sweat pants and sweatshirt were microscopically similar to Defendant's hair; and Defendant's DNA was found in the waist band of the sweat pants. Gasoline was also present on the clothing. DNA testing established that the blood on Chattin's truck belonged to the victim, Donald Bond.

Mike Chattin testified that Defendant knocked on the door of the bedroom where Chattin and Carol Bishop were sleeping at about 2:30 a.m. and asked to speak with Chattin privately. Chattin followed Defendant to a second bedroom, where Defendant told him that he had borrowed Chattin's Dodge Ram truck and pointed to the bed where Deputy Bond's service weapon, the front of Bond's bulletproof vest, and Defendant's assault rifle were lying. Defendant then announced that he had killed a policeman. Defendant said that he regretted leaving shell casings and not getting an entire bulletproof vest but that the killing had provided him "stress relief." He told Chattin that he had killed fifteen to seventeen other people, two or three of whom were policemen. When the two men heard an ambulance pass by, Defendant chuckled and said, "[i]t ain't going to do them no good, they're too late." Defendant told Chattin he had gone to Nunley's to burn it. When he saw Deputy Bond pull into the parking lot, he crouched behind the truck.[5] When Bond approached, he came out from behind the truck and shot Bond. Defendant told Chattin that he picked up Bond and tried to pull off the vest, which came apart and caused Bond's head to hit the ground. According to Chattin, Defendant had "liked it so much that [he] picked him up and did it again." Defendant offered to give Deputy Bond's gun to Chattin and expressed the need to "get rid of that stuff" but refused Chattin's offer to help him do so.

After going outside to talk with Chattin's neighbor, Pam Treadway, about the police cars rushing to Nunley's produce stand, Defendant asked Chattin to take him back to the crime scene. Chattin refused. Defendant related to Chattin that when Chattin's truck had not started after he shot Bond, he tried to drive away in Bond's patrol car but could not get it

---

5. It is unclear from the record whether Defendant crouched behind Chattin's truck or the Ford truck already parked at Nunley's.

into gear.[6] Finally, he started Chattin's truck and drove away. Defendant presented Chattin some tomatoes he had brought from Nunley's as a "present." Defendant said that he would need food and protection and that Charlie Sims should know about what had happened. Chattin explained that Defendant was not excited while telling him about the murder but "was very calm, [and] showed great pleasure."

After hearing Defendant's story, Chattin returned to his bedroom, woke up Bishop, and told her what Defendant had told him. Implementing a plan the two worked out to elude Defendant and escape the house, Chattin told Defendant that he was leaving in his own car to eat breakfast with Bishop who left first in her car around 3:30 a.m. and headed to her own home. Chattin stopped to get gasoline, unsuccessfully tried to contact a friend of his who was a policeman, and stopped again for gas. After checking to see that Bishop was safely at home and trying once again to reach his friend, Chattin called 911, then waited at the convenience store where he encountered the police officer at 4 a.m. Chattin testified that he did not kill Deputy Bond.

The parties stipulated that Defendant had filed a civil rights lawsuit in federal district court in Chattanooga in 1999 seeking monetary damages from three Chattanooga police officers and the City of Chattanooga. This case was set for trial in mid-September 2001. The State presented proof that Malcolm Headley, a friend of Defendant, sold Defendant the MAK–90 assault rifle used to kill the victim. Defendant also asked Headley to sell him a bulletproof vest. Headley refused but told Defendant where he could purchase one.

Defendant told Headley that he had had "trouble with some law officers" and "had a lawyer working on it." Defendant said that he was "going to take care of this problem." When Headley asked if Defendant was going to court, Defendant replied, "Well, yeah, and if I could kill somebody, I will, even if I have to sneak up on them and do it." When Headley gave Defendant a "funny" look, Defendant said that he was joking. Carl Hankins testified that Defendant told him when they were talking about the police that Defendant "very much disliked the police department." Defendant also told Hankins that if a police officer tried to take him into custody, Defendant "would kill a man before he would ever take a beating like he took before."

The defense theory at trial was that Chattin was the real killer and had framed Defendant. The proof showed that Chattin owned several guns and that ammunition of the type used in the MAK–90 was found in his house. Chattin also was involved in buying drugs and using methamphetamine. After the murder he had warned persons to whom he had given or sold guns not to let the police know where the weapons had come from. Chattin's wife, Tina Hunt, left him in the spring of 2001 because of physical abuse and his drug use. Sheriff's officers thereafter served a restraining order on Chattin and left a warning at his house when he violated the order by stalking his wife at her work. The defense presented testimony that Chattin thought his wife was dating a policeman[7] and that the police were harassing him. The wife of one of Chattin's drug dealer friends testified that the week-

---

**6.** Other testimony established that the brake pedal in Deputy Bond's patrol car had to be depressed before it could be put into gear from park.

**7.** This was false. Chattin's wife was dating a co-worker at the fast food restaurant where she worked.

end before September 6, Chattin told her that he wanted to kill somebody or burn something. The defense presented inconsistencies in Chattin's accounts of the circumstances surrounding Defendant's telling him about the killing and Chattin's "escape" from the house afterward. Another of Chattin's acquaintances testified that Defendant had answered the telephone at 1:30 a.m. on the night of the murder when the witness called Chattin's house.

Pam Treadway, Chattin's neighbor, testified that in May 2001, Chattin had asked her to lie to a sheriff's officer who had come to his house looking for him and tell the officer that he was not at home. Later that night Chattin came to Treadway's house, laid some papers and a .9 mm gun on her coffee table, and told her not to touch the gun, that he was going to "kill him a cop." Chattin left the gun with Treadway. Treadway also testified that on the night of the killing she looked through her window and saw Defendant sleeping on the couch in Chattin's living room. Treadway said that she saw Chattin and Bishop leave Chattin's house around midnight September 6 and come back at 12:30 a.m. Chattin then followed Bishop in his car as she drove away in her car. Around 1:30 a.m. she saw Cantrelle leave in Chattin's truck. About 2 a.m. Treadway observed Cantrelle packing garbage bags and "stuff" behind the seat of a Chevette and then drive away. Later that night, as she and Defendant were watching police cars respond to the murder, Defendant, who was dressed in shorts and a top, acted like someone who had just woken up. After the murder, Treadway said, Chattin told her to keep her mouth shut or he would shut it for her; he also threatened to set fire to her house and unscrewed the bulbs out of her security lights.

The defense also presented the testimony of Dr. Marilyn Miller, a professor of forensic science and crime scene investigation. Dr. Miller testified in detail about the shortcomings in the criminal investigation of this case, including inadequate security at the crime scene; the failure to test for fingerprints on the hood of Chattin's truck; and the "meaningless" gunshot residue tests. Dr. Miller also testified that chemical examination of the fibers found in the victim's patrol car disclosed that they had not come from the same source as the burlap fabric sown on the sweatshirt found beneath the deck at Chattin's house.

To raise doubt about Defendant's willingness to commit a murder on the night of September 5th, the defense called the attorney representing Defendant in his federal law suit to testify that he and Defendant had an appointment scheduled for 8:30 a.m. on September 6 to discuss a possible settlement of the case. On cross-examination of the attorney, the State introduced Defendant's July 2001 answer to an interrogatory in the case, in which he stated that he had "grown to despise the police" and felt that they were "crooked."

This ended the proof in the guilt/innocence phase of the trial. Following deliberations, the jury returned its verdicts, convicting Defendant of first degree premeditated murder, first degree felony murder committed during the perpetration of arson, and first degree felony murder committed during the perpetration of theft.

### Sentencing Phase of Trial

Before sentencing, defense counsel notified the trial court of Defendant's decision not to present any mitigating evidence at the sentencing hearing. Because Defendant raises an issue regarding this decision, we repeat here the colloquy that en-

sued between Defendant and the trial court:

Q [by the trial court]: With reference to the sentencing hearing, it's also my understanding you do not wish that your counsel put on any defense proof, any mitigating circumstances, any evidence at all; is that correct?

A [by Defendant]: Yes, sir.

Q: Do you understand that you have the right to present mitigating evidence, determine—and you understand the importance of presenting mitigating evidence, in both the evidence that was presented—any mitigating evidence that may arise from the guilt or innocence phase of the trial, as well as any mitigating evidence that you can put on through your attorneys during the sentencing phase of the trial; do you understand the importance of that?

A: Yes, sir.

Q: And do you understand the risk of not putting on any mitigating evidence during this sentencing phase of the trial; the risk, by not putting on any mitigating evidence, it may not offset the aggravating circumstance the State's offering in this case, do you understand that?

A: I do.

Q: And by putting on mitigating evidence, it may offset that aggravating circumstance; do you understand that?

A: Yes, sir.

Q: And have you discussed with your attorneys about this?

A: I have.

THE COURT: And [defense counsel] Ms. Green, have you and [defense counsel] Ms. Gothard discussed this with [Defendant], about the risks involved in not putting on any mitigating evidence?

MS. GREEN: We have discussed the risks, yes, sir.

THE COURT: And the fact that the mitigating evidence could possibly offset the aggravating circumstance?

MS. GREEN: We've discussed only in general terms, Your Honor. [Defendant] has refused for some months now to allow us to actually present to him what we would be presenting in the hearing itself.

Q: (By the Court) Do you understand—of course, this was mentioned back when we were in Nashville selecting the jury in this case, your counsel, of course, mentioned to the jury, we talked about mitigating circumstances at that time. Of course, you certainly understand, [Defendant], do you not, what I mean by mitigating circumstances?

A: Yes, sir, I do.

Q: And you understand that the defense has investigated, spent a lot of time investigating possibilities of mitigating circumstances and are prepared to present mitigating evidence in this trial; do you understand that?

A: Yes, sir, I do.

Q: Knowing all that, is it your conscious decision and your voluntary decision to forego presenting any mitigating evidence in this trial?

A: That is correct.

Q: Has anybody put any pressure on you in any way to get you to do this?

A: No, sir.

Q: Do you have any questions you'd like to ask me about this, [Defendant]?

A: Not at this moment.

. . .

THE COURT: All right. Let me say further, that after listening to [Defendant] in this case and counsel, I do find that [Defendant] is competent to waive mitigation in this case and I do find that he is waiving the presentation of miti-

gating evidence knowingly and voluntarily and understandingly at this time.

Thereafter, in the presence of the jury, the defense stated that it would present no further evidence. The State relied on the evidence presented during its case-in-chief. Victim impact statements were also presented by Deputy Bond's mother and mother-in-law.

Following deliberations, the jury sentenced Defendant to death for each of Defendant's murder convictions. The jury found that the State had proved beyond a reasonable doubt the only alleged aggravating circumstance, that the murder was committed against a law enforcement officer engaged in the performance of official duties, and Defendant knew or reasonably should have known that such victim was a law enforcement officer engaged in the performance of official duties. *See* Tenn. Code Ann. § 39–13–204(i)(9). In imposing death sentences, the jury further found that the statutory aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt.

The Court of Criminal Appeals affirmed Defendant's convictions and sentence. This case is before us on automatic direct appeal. *See* Tenn.Code Ann. § 39–13–206(a)(1) (2006).

## ANALYSIS

### I. Waiver of Mitigation Evidence

#### A. *Defendant's Competency*

■ Throughout the appeals process, Defendant's primary issue has been that the circumstances surrounding his waiver of his right to present mitigation evidence at his sentencing hearing violated his con-stitutional rights. He bases his contention on several grounds, the first being that the trial court violated his due process rights by failing to make adequate inquiry into his competence to waive his right to present mitigation evidence. *See Filiaggi v. Bagley,* 445 F.3d 851, 858 (6th Cir.2006) (recognizing that "[t]he due-process right to a fair trial is violated by a court's failure to hold a proper competency hearing where there is substantial evidence that a defendant is incompetent"). Defendant points out that the trial court had available to it reports from mental health experts that should have alerted the trial court to the need for his further evaluation.[8] This Court has not previously addressed the minimum criteria which will require a trial court to order a competency evaluation in the context of a capital sentencing hearing and in the absence of a request for a competency evaluation from defense counsel.

In addition to the colloquy between Defendant and the trial court set forth above, the following colloquy between the trial court and counsel ensued immediately thereafter:

[PROSECUTOR] MR. STEELMAN: Your Honor, the only other issue would be that *State v. Smith,* which was subsequent to *Zagorski,* states in the opinion that the court inquired of counsel whether there was any indication, based on what counsel knew, that the defendant was somehow incompetent to make the decision [to waive the right to present mitigation evidence].

THE COURT: All right. Ms. Green.

8. Defendant's argument in his brief to this Court on this issue contains numerous references to assertions about his mental health, both lay and expert, that were made to the trial court *after* his trial had concluded. These assertions are irrelevant with respect to the issue of whether the trial court should have sua sponte ordered an inquiry into Defendant's competence *prior to* the sentencing hearing.

[DEFENSE COUNSEL] MS. GREEN: The only thing I know is in Dr. [Merikangas'] report he found *a lesion on the brain in the right frontal lobe area, which would go to controlling [Defendant's] impulsivity and his decision-making functions. That, of course, impacts his ability to make rational decisions.* There is no other indication of— there's no indication, that I know of, of incompetency to make the decision. And that is a mental illness, however, in terms of the brain injury and some of the after effects of the brain injury.

THE COURT: Have you seen in any way, as far as your dealings with [Defendant] in preparation for this trial, either your or [defense counsel] Ms. Gothard, in preparation for the guilt or innocence phase of the trial, that that injury to the brain in any way affected his ability to communicate with you, to discuss the case with you as far as preparation for the guilt or innocence phase of the trial?

MS. GREEN: The only thing that I've noticed, Your Honor, and I've told [Defendant] this, he is a very concrete thinker; once he seems to have his mind made up to something, it's that way or no way.

THE COURT: I don't know if necessarily that's a character flaw.

MS. GREEN: It's been difficult at times to try to explain to [Defendant] some of the concepts of mitigation, but that's about it.

THE COURT: But you did indicate that this is nothing that just appeared overnight, this has been his position from the very beginning, as I understand it, is that correct?

MS. GREEN: It has been, yes, sir.

THE COURT: All right. I'm satisfied. Ms. Gothard, is that the same finding that you had, as far as competence, in your dealings with him in preparation for this trial in the guilt or innocence phase?

MS. GOTHARD: I do not have any questions regarding his competency, he's always been able to communicate with me. He and I have met, generally speaking, on a weekly basis, for at least an hour and a half a meeting, since his arrest. Sometimes we met more than once a week. There have been a few times when I have missed a week, but that's been very rare. Never had any difficulty discussing anything other than I think it is as Ms. Green said, I think that complex reasoning is sometimes difficult and he's very stubborn, but other than that—I say that in a friendly way, but, no, I have no questions about his competency to make this decision.

THE COURT: And you find there is no reason why he cannot voluntarily waive his right to this hearing today? There's nothing that you found in your discussions with him any reason why he cannot?

MS. GOTHARD: No, Your Honor. I've had long-term discussions with him about this and he's made that very clear to me, to the point of being angry with me for trying to discuss it.

THE COURT: All right. Well, then there's nothing that would change the court's opinion as far as the court's finding that he is competent to knowingly and voluntarily and understandingly and intelligently waive his right to put on mitigating evidence, and the court does so find.

(Emphasis added).

The report from Dr. Merikangas referred to by defense counsel Green was

filed under seal prior to trial.[9] That report is dated September 9, 2003, and is from James R. Merikangas, M.D., of Georgetown University Hospital, Department of Psychiatry, who examined Defendant on July 29, 2003, at the Hamilton County Jail "in regard to his neurological and psychiatric condition, both presently and prior to the alleged offense." That report provides as follows:

[Defendant] is a brain-damaged individual, with structural damage to the frontal lobe of his brain demonstrated by CAT scan prior to the crime for which he is charged. This damage is in a location associated with dyscontrol of impulses, impairment of abstract reasoning and planning ability.

In addition, [Defendant] has paranoid ideation and delusional ideation of the sort commonly seen in patients with the diffuse brain atrophy demonstrated by his previous CAT scan and his current MRI brain scans.

The examination of his blood tests is also probative, because of the finding on 4/04/03 in the Erlanger Health System records of a blood glucose level of 59. This abnormally low blood sugar level [hypoglycemia] is in the range reported in the scientific literature as the causal of violent, delirious, and unplanned activity. There is ample forensic precedent for hypoglycemia being exculpatory in criminal cases.

IN SUMMARY: [Defendant] is an individual with long-standing brain damage and serious hypoglycemia whose developmental history, psychological test-ing, previous medical and psychiatric treatment, and collateral information [see separate reports] document serious impairment of the ability to understand, control, and plan his action in the face of day-to-day functioning, and particularly in the face of stress or threat. This impairment is not the result of any factor within the control of [Defendant], having both congenital and acquired causes.

Following its colloquy with defense counsel, the trial court instructed defense counsel to advise Defendant about "what the mitigating evidence would have been" and gave defense counsel the time in which to do that. After defense counsel conferred with Defendant, attorney Green informed the trial court that they had "completed a summary of it."[10] The trial court then asked Defendant if, "after having gone over that and looked at that mitigating evidence with [your attorneys], has there been anything about that that has changed your mind?" Defendant answered that there was not and that he still wished to proceed and waive the proof of any mitigating evidence. Based on these exchanges, the trial court determined that Defendant was competent to waive the presentation of mitigation proof.[11]

██ Both the Fourteenth Amendment to the United States Constitution and Article I, section 8 of the Tennessee Constitution prohibit the trial of a person who is mentally incompetent. *Pate v. Robinson,* 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *State v. Blackstock,* 19

9. Dr. Merikangas' report was also attached to Defendant's second amended motion for new trial.

10. Defense counsel did not proffer the mitigation evidence into the record.

11. After the State presented its victim-impact witnesses, the trial court yet again questioned Defendant about his decision to waive mitigation proof. Defendant responded that he did not wish to present mitigation proof and that it was his belief "that there's nothing that could be said on [his] behalf or anybody that knows [him] to change anybody's mind."

S.W.3d 200, 205 (Tenn.2000); *see also Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) ("It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial."). The Supreme Court has articulated the test of competency as whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings." *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (internal quotation marks omitted); *see also State v. Reid*, 164 S.W.3d 286, 306 (Tenn.2005) (recognizing that a defendant must have " 'the capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense' ") (quoting *State v.*

*Black*, 815 S.W.2d 166, 174 (Tenn.1991)). Federal due process requires no difference in the test of competence applicable to the guilt phase of a trial and that applicable to the sentencing phase. *See United States v. Sanchez*, 38 F.Supp.2d 355, 367 (D.N.J. 1999); *United States v. Gigante*, 996 F.Supp. 194, 198 (E.D.N.Y.1998). This Court has previously determined that a defendant found competent to stand trial is also competent to waive proof of mitigation. *See Zagorski v. State*, 983 S.W.2d 654, 659 (Tenn.1998). Accordingly, a capital defendant is competent to waive the presentation of mitigation proof at sentencing if he or she meets the test of competency to stand trial set forth in *Dusky/Reid*.[12]

It is undisputed that, in this case, neither Defendant nor his lawyers requested at any point either before or during the trial that his competency to stand trial be evaluated.[13] Defendant contends that,

---

12. Some courts have applied a different test. For instance, the Ohio Supreme Court measures a capital defendant's competence to waive mitigation proof by determining whether the defendant "has the mental capacity to understand the choice between life and death and to make a knowing and intelligent decision not to pursue the presentation of evidence. The defendant must fully comprehend the ramifications of his decision and must possess the ability to reason logically, *i.e.*, to choose means that relate logically to his ends." *State v. Cowans*, 87 Ohio St.3d 68, 717 N.E.2d 298, 313 (1999) (quoting *State v. Ashworth*, 85 Ohio St.3d 56, 706 N.E.2d 1231, 1241 (1999). *See also Singleton v. Lockhart*, 962 F.2d 1315, 1322 (8th Cir.1992). These courts relied on *Rees v. Peyton*, 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966), a Supreme Court case addressing the test of competency to be met when a defendant sentenced to death wishes to abandon subsequent collateral proceedings. That test is "whether [the defendant] has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand

whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." *Id.* at 314, 86 S.Ct. 1505. Tennessee Supreme Court Rule 28, section 11(B)(1), parallels the *Rees* test, but "is limited ... to the unique circumstances involved when a petitioner in a capital case seeks to withdraw an already-filed post-conviction petition and waive further post-conviction relief." *Reid v. State*, 197 S.W.3d 694, 701 n. 7 (Tenn.2006).

13. Indeed, in an affidavit attached to Defendant's second amended motion for new trial, one of Defendant's trial attorneys stated that "a decision had been made by the defense team [prior to the sentencing hearing] not to challenge [Defendant's] competency." Also attached to Defendant's second amended motion for new trial is a May 5, 2005, affidavit from Dr. Pamela Auble in which she attested that, based on her November 3, 2003, interview with Defendant, she "had some concerns about his competency because of his feelings of having been 'betrayed' by his attorneys, but [she] found [Defendant] to have a rational and factual understanding of the charges against

nevertheless, the trial court should have sua sponte ordered his competency to be evaluated on the basis of the colloquies that took place prior to the sentencing hearing and the contents of two reports from mental health experts that were submitted under seal prior to trial.[14] We note, however, that these two reports, the one from Dr. Merikangas and one from Dr. Pamela Auble dated September 7, 2003, were each simply submitted on September 9, 2003, as an "Expert's Report Filed Pursuant to Reid Requirements." *See State v. Reid,* 981 S.W.2d 166, 174 (Tenn.1998). The *Reid* case sets forth the procedure to be followed "in every death penalty trial in which the capital defendant intends to introduce expert mitigation evidence relating to mental condition at the sentencing hearing of his or her trial." *Id.* Thus, defense counsel submitted these two reports in conjunction with their potential use as mitigation evidence. Significantly, these reports were *not* obtained in conjunction with an evaluation of Defendant's competence to stand trial or sentencing or in conjunction with an attempt to demonstrate the need for such an evaluation.[15] Nor did defense counsel ever specifically request the trial court to read these reports prior to making its ruling regarding Defendant's decision to waive the presentation of mitigation proof.

Defendant's argument presents us with the issue of the quantum and quality of proof necessary to require a trial court to order a competency evaluation in the absence of any request for one. *Cf. State v. West,* 728 S.W.2d 32, 34 (Tenn.Crim.App. 1986) (recognizing that mental evaluations are required only if the evidence "warrant[s] a belief that the defendant is incompetent to stand trial"). The United States Court of Appeals for the Sixth Circuit has articulated this inquiry as " '[w]hether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial.' " *Williams v. Bordenkircher,* 696 F.2d 464, 467 (6th Cir.1983) (quoting *Pate v. Smith,* 637 F.2d 1068, 1072 (6th Cir.1981)). The Sixth Circuit has recognized that

> [t]he constitutional obligation to hold an evidentiary hearing depends heavily on the factual circumstances of each case. Neither the defendant's medical history, nor the opinion of psychiatric experts, nor the defendant's behavior at trial should be viewed in isolation. These are merely relevant factors to be considered in determining whether an evidentiary hearing is necessary. The presence or absence of evidence relating

him and to have the capacity to assist in the process of jury selection and the upcoming guilt/innocence phase of the trial." Dr. Auble also acknowledged in this affidavit that she had had "discussions with [Defendant's] attorneys regarding their perceptions of [Defendant's] understanding of the charges and his participation in his defense."

14. Defendant also refers in his brief to his refusal to consider a plea bargain offer of life without parole, citing to the hearing on his motion for new trial. Information brought to the trial court's attention during the motion for new trial hearing is not relevant to a decision made prior to that time.

15. Defendant asserts in his brief that "[i]t can be inferred from the record that the trial judge never read the experts' reports since he made no reference to them or to the findings contained therein." We specifically decline to draw such an inference from a silent record. Moreover, we reject Defendant's implication that the trial judge should be faulted in the event he did not read the reports prior to the sentencing hearing and consider them in conjunction with Defendant's competency. As set forth above, the reports were submitted for purposes other than any concern about Defendant's competency at the time the sentencing phase of trial began.

to one of these factors is not conclusive on the ultimate question of whether an evidentiary hearing is needed to insure that the defendant is capable of aiding in the preparation of his or her defense. *Id.* at 466 n. 1.

With respect to the scope of our review, the Court of Criminal Appeals has correctly observed that,

> [i]n determining whether a court should have conducted a hearing *sua sponte* before permitting an accused to go to trial or enter a plea of guilty or nolo contendere, an appellate court may only consider those facts which were before the court when the trial commenced or the pleas were entered.

*Berndt v. State,* 733 S.W.2d 119, 122 (Tenn.Crim.App.1987).

### *Minimum Criteria for Requiring Competency Evaluation*

The General Assembly has provided Tennessee trial courts with the discretionary option of ordering the evaluation of a criminal defendant whose competency to stand trial becomes an issue:

> [w]hen a defendant charged with a criminal offense *is believed to be incompetent to stand trial,* or there is a question about the defendant's mental capacity at the time of the commission of the crime, the criminal, circuit, or general sessions court judge *may,* upon the judge's own motion or upon petition by the district attorney general or by the attorney for the defendant and after hearing, order the defendant to be evaluated on an outpatient basis.

Tenn.Code Ann. § 33–7–301(a)(1) (2001) (emphases added); *cf. State v. Harrison,* 270 S.W.3d 21, 33 (Tenn.2008) (recognizing that "[i]f the issue of the defendant's competency to stand trial is *properly raised,* the trial court must conduct a hearing to determine whether the defendant has the

capacity to understand the nature and purpose of the proceeding, to consult with counsel, and to otherwise assist in preparing his or her defense"). Neither the statute nor *Harrison* offers any guidance, however, about the quantum of proof necessary to establish a belief that a defendant is incompetent to stand trial.

The Supreme Court has stated that, in determining a defendant's competency to stand trial, factors such as the "defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant." *Drope v. Missouri,* 420 U.S. at 180, 95 S.Ct. 896; *see also State v. Taylor,* 771 S.W.2d 387, 396 (Tenn.1989). Further, "even one of these factors standing alone may, in some circumstances, be sufficient." *Drope,* 420 U.S. at 180, 95 S.Ct. 896.

Divining another person's mental state is, of course, one of the most difficult of human endeavors. As recognized by the Supreme Court,

> [t]here are ... no fixed or immutable signs which invariably indicate the need for further inquiry to determine [a criminal defendant's] fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts.

*Id.*

■ In this case, neither of Defendant's lawyers contended that Defendant was incompetent to make the decision to waive his right to present mitigation evidence. Indeed, Defendant's lead lawyer assured the trial court that Defendant *was* competent. *Cf. Pate v. Robinson,* 383 U.S. 375, 384, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966) (noting that "counsel throughout the proceedings insisted that Robinson's present

sanity was very much in issue"). The record reveals only a single arguable indication that Defendant's competence—that is, his "ability to consult with his lawyer with a reasonable degree of rational understanding" and have "a rational as well as factual understanding of the proceedings"—might, in any way, be suspect. That indication is in Dr. Merikangas's report,[16] referred to by defense lawyer Green in her colloquy with the trial judge: [17]

> [Defendant] is a brain-damaged individual, with structural damage to the frontal lobe of his brain demonstrated by CAT scan prior to the crime for which he is charged. *This damage is in a location associated with* dyscontrol of impulses, *impairment of abstract reasoning* and planning ability.
>
> . . .
>
> [Defendant] is an individual with long-standing brain damage and serious hypoglycemia whose developmental history, psychological testing, previous medical and psychiatric treatment, and collateral information [see separate reports] document *serious impairment of the ability to understand, control, and plan his action in the face of day-to-day functioning,* and particularly in the face of stress or threat.

**16.** This Court has also reviewed carefully Dr. Auble's report. It contains a detailed summary of Defendant's troubled mental health history. It does not contain any opinion regarding Defendant's competency. It reflects that Defendant's "Full Scale IQ was in the middle of the average range"; that his "abstract reasoning with verbal material was good"; that his "[a]bility to alternate between different concepts was within normal limits"; that he "appeared to be an individual who looks for simple solutions to complex problems"; that he was "able to complete high school"; and that he "has been able to be a productive employee in the past." The report also states that Defendant "can behave impulsively at times and he does not have very good judgment." Dr. Auble was of the opinion, based on testing and historical records, that "psychiatric diagnoses that should be considered include: depression (recurrent possibly with psychotic features), delusional disorder, generalized anxiety or post-traumatic stress disorder, intermittent explosive disorder, marijuana abuse/dependence, alcohol abuse, and/or one of the Cluster B personality disorders." Significantly, the report states that Defendant's "cognitive testing was considered to be valid. From the neuropsychological tests, there appeared to be deficits in two areas. There were mild motor difficulties with his right hand and more striking impairments with memory for abstract visual designs. *Other abilities were, overall, within normal limits.*" (Emphasis added). Dr. Auble prepared an addendum dated November 18, 2003, following her review of additional materials and a November 3, 2003, interview with Defendant. She concluded in this addendum that "[t]he additional materials generally supported [her] earlier findings" and that her previous conclusions "continued to be fundamentally the same." The addendum contains no opinion regarding Defendant's competence.

We agree with the Utah Supreme Court that
> [f]itness to stand trial is a much narrower concept than moral or social wellness, and thus the fact that a defendant is twisted and disturbed does not necessarily mean he is unfit for trial. The fact that a person is mentally ill, displays bizarre, volatile, and irrational behavior, or has a history of mental illness, does not mean that he or she is incompetent to stand trial. A defendant may be fit for trial even though his mind is otherwise unsound.

*Taylor v. State,* 156 P.3d 739, 763 (Utah 2007) (quoting *Jacobs v. State,* 20 P.3d 382, 386 (Utah 2001)).

**17.** We do not imply by our reference to the language of this report that the trial judge was under any obligation to read it with respect to Defendant's competency during trial, given the circumstances under which it was filed. Defense counsel never specifically requested the court to do so. We refer to it specifically because it was referred to by attorney Green during her colloquy with the trial court and in order to address fully Defendant's argument to this Court concerning his competency.

(Emphases added). The question before us is whether this information was sufficient to require the trial court to inquire further into Defendant's competency when combined with the trial court's own observations of and communications with Defendant [18] and Defendant's own lawyers' statements about Defendant's competence. We hold that it was not and that the trial court therefore did not err in failing to order sua sponte that Defendant's competency be evaluated.

Initially, we stress that Dr. Merikangas's report was prepared *not* for the purpose of determining Defendant's competence to stand trial but rather for the purpose of mitigation evidence in the event a sentencing hearing was held. Dr. Merikangas therefore offered no opinion regarding Defendant's competence to stand trial.

Second, a close reading of Dr. Merikangas's report reveals merely that Defendant's brain damage is *in an area associated with* the impairment of abstract reasoning. The report does *not* state that Defendant has, himself, suffered an impairment of his abstract reasoning ability as a result of his brain damage. The report is simply not that specific.

The most troublesome portion of the report is its conclusion that Defendant's physical and psychological conditions suggest that he suffers "*serious impairment of the ability to understand, control, and plan his action in the face of day-to-day functioning.*" Had defense counsel voiced during the colloquy their own concerns about Defendant's competence, and had defense counsel proffered this report in conjunction with an assertion that Defendant had displayed an inability to consult with them "with a reasonable degree of rational understanding," *Dusky*, 362 U.S. at 402, 80 S.Ct. 788, the trial judge might have been faced with sufficient information to have alerted him to the need for further inquiry. Instead, one of Defendant's lawyers made a brief reference to Dr. Merikangas' report during her colloquy with the trial judge and then asserted that the "only thing" she had noticed regarding her ability to discuss the case with Defendant [19] was that he "is a very concrete thinker." She did not ask the trial judge

---

**18.** In his order denying Defendant's motion for new trial, the trial judge noted that he had "personally observed [Defendant] for several years of court appearances and the trial in this matter."

**19.** Defendant makes much in his brief about the terminology the trial judge used during his colloquy with defense counsel. Specifically, the trial judge asked defense counsel about Defendant's "ability to communicate with you, to discuss the case with you as far as preparation for the guilt or innocence phase of the trial?" Defendant asserts that the trial judge's focus "should have been on Defendant's ability to *rationally understand and assist* in his defense, particularly with respect to the *sentencing phase* of the trial."

We acknowledge that the *Dusky* test of competency is whether Defendant had "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding-and whether he has a rational as well as factual understanding of the proceedings." 362 U.S. at 402, 80 S.Ct. 788. We do not think the *Dusky* language is a litmus test, however. Rather, it sets forth the object of the inquiry. The terminology a trial judge uses to make the inquiry is unimportant so long as it satisfies the purpose of the inquiry. The trial judge in this case asked specifically about Defendant's ability to communicate and discuss his case with his lawyers. Any reasonable understanding of the terms "communicate" and "discuss" would include an analysis of whether Defendant had "a rational as well as factual understanding of the proceedings." Finally, we are not troubled by the trial judge's reference to the guilt/innocence phase of the trial because that had been the most recent focus of the proceedings and one about which Defendant and counsel had to repeatedly communicate and understand during the immediate past.

to read the report before making his decision. Co-counsel went further and stated unequivocally that she "d[id] not have any questions regarding his competency." When faced with these positive indications of Defendant's rational understanding, combined with the trial court's own observations of Defendant during the course of the trial, this language in Dr. Merikangas' report was simply not enough to require the trial court to order, sua sponte, further inquiry, particularly in light of the manner in which the report was placed before the judge. *Cf. Pate*, 383 U.S. at 385–86, 86 S.Ct. 836 (holding that trial court erred when it failed to make adequate inquiry into a criminal defendant's competence to stand trial when counsel for the defendant insisted throughout the trial that the defendant's present sanity was at issue and proffered expert and lay testimony to that effect); *State v. Haun*, 695 S.W.2d 546, 549 (Tenn.Crim.App.1985) (holding that, where both defendant's attorney and prosecutor reported to trial court during trial that defendant was disoriented and that, upon defendant's physical exam, he was found drugged and suicidal, and where record showed that defendant had history of previous mental disorders, "it was incumbent upon the trial judge to conduct a hearing to determine the competency of the defendant to continue at trial, and such duty was incumbent upon the judge even in the absence of a motion for such hearing"). *But see United States v. Tucker*, 204 Fed.Appx. 518, 520 (6th Cir.2006) (holding that trial court did not err in failing to hold competency hearing where "three separate attorneys represented [defendant] and none of them expressed personal concern about [defendant's] compe-

tence"); *People v. Lewis*, 43 Cal.4th 415, 75 Cal.Rptr.3d 588, 181 P.3d 947, 1026 (2008) (holding that trial court committed no error in not conducting a competency hearing where "there was no substantial evidence that defendant's lack of cooperation [with his attorneys] stemmed from inability rather than unwillingness, and the trial court's comments suggest that it found defendant's problem to be of the latter type rather than the former").

 The Supreme Court has recognized the significance of a defendant's lawyer's assertions (or lack thereof) regarding the defendant's competence. *See Drope*, 420 U.S. at 176–77 & 177 n. 13, 95 S.Ct. 896; *see also Medina v. California*, 505 U.S. 437, 450, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992) (recognizing that "defense counsel will often have the best-informed view of the defendant's ability to participate in his defense"). Given the attorney-client relationship that must be forged in order for an attorney to represent his or her client effectively, and given every lawyer's ethical duty to represent his or her client competently, *see* Tenn. Sup.Ct. R. 8, RPC 1.1, it is entirely appropriate that a trial court should be able to rely on a criminal defendant's lawyer in this regard; that is, a trial judge may rightfully expect a defendant's lawyer to offer a candid professional assessment of the defendant's ability to consult about his or her case "with a reasonable degree of rational understanding."[20] We will not ask trial courts to second-guess a defense lawyer's assessment that her client is competent unless and until there exist significant contrary indications known to the trial judge.[21]

---

**20.** We are constrained to also point out, however, that lawyers are not trained mental health experts and a lawyer's failure to raise a red flag about her client's competence does not, in and of itself, establish her client's

competence. *See Odle v. Woodford*, 238 F.3d 1084, 1088–89 (9th Cir.2001).

**21.** With respect to what might constitute sufficient significant contrary indications, the

This case does not include such significant contrary indications.[22]

Defendant asserts in his brief to this Court that the trial court did not familiarize itself with Dr. Auble's and Dr. Merikangas's reports prior to finding Defendant competent to waive mitigation proof. The record reveals that the defense had

---

*Odle* case is instructive. Odle had suffered severe head trauma that necessitated a temporal lobe lobotomy; afterward, he experienced psychological issues, some of which made it difficult for him to control his impulses. A decade after his lobotomy, Odle was convicted of two first degree murders and sentenced to death. "The trial judge had before him a comprehensive record of [Odle's psychiatric] history and heard the testimony of expert witnesses who described the extensive damage to Odle's brain." 238 F.3d at 1088. One doctor had "testified that Odle's brain injury would probably cause behavioral disturbances beyond his control. This diagnosis was consistent with Odle's complaints, documented during his hospitalizations, that he often felt unable to control his impulses." *Id.* Despite this evidence, Odle's attorneys never requested—and the trial court never ordered—an evaluation of Odle's competence to stand trial. While the Ninth Circuit agreed that "defense counsel will often have the best-informed view of the defendant's ability to participate in his defense," *id.* (quoting *Medina*, 505 U.S. at 450, 112 S.Ct. 2572), it also stated as follows:

> The observations of those interacting with petitioner surely are entitled to substantial weight. But personal observations cannot overcome the significant doubt about Odle's competence raised by the clinical evidence. The record revealed an extensive history of mental impairment, and expert testimony and jail records suggested that Odle's mental problems lay not just in the past, but continued to the time of trial. *Cf. United States v. Loyola–Dominguez*, 125 F.3d 1315, 1318–19 (9th Cir.1997) (competency hearing required where defendant attempted suicide on eve of trial and trial court failed to elicit adequate information to dispel concerns). And, as the trial judge was aware, Odle was missing a piece of his brain the size of a grapefruit.

*Id.* at 1089. Accordingly, the Court of Appeals for the Ninth Circuit held that the trial court erred in failing to conduct a competency inquiry. *Id. See also Drope*, 420 U.S. at 175–80, 95 S.Ct. 896 (holding that trial court erred in failing to order inquiry into defen-

dant's competence when trial court had before it expert proof that defendant needed psychiatric care at the time of trial; that he "had a difficult time relating" and was "irrelevant in his speech"; proof that he was engaging in irrational behavior immediately prior to trial; and proof that he attempted suicide during the trial); *Rhay v. White*, 385 F.2d 883, 884–86 (9th Cir.1967) (recognizing that, although counsel did not request competency evaluation, trial court should have conducted one where it had proof before it that the defendant "had such paranoid traits as to make him unable to trust people"; a psychiatrist observed the defendant during trial because of concerns that he would "erupt explosively against someone in the courtroom"; and counsel's communicated concerns to the trial court during trial that the defendant "was very close to a psychotic break" and that both defense lawyers had "noticed a deterioration in the defendant's condition" during the trial).

22. We have carefully reviewed the entire technical record in this case, including the multitude of ex parte pleadings filed by defense counsel (and transmitted to this Court under seal) in conjunction with seeking the approval of expert services pursuant to Tennessee Supreme Court Rule 13. In several of defense counsel's ex parte motions, defense counsel referred to, either directly or through attachments including affidavits, Defendant's troubled mental health history and brain injury. The trial court entered orders regarding each of these motions. We specifically decline to hold that the trial court should have determined, prior to trial and sua sponte, that, based upon any of the assertions contained within any of these ex parte motions seeking the approval of expert services, Defendant's competency should have been evaluated. *Cf. Wilcoxson v. State*, 22 S.W.3d 289, 310 (Tenn. Crim.App.1999) (recognizing that "evidence of a defendant's past psychiatric problems does not necessarily require counsel to ask for a competency hearing if the [defendant's] behavior does not reflect incompetence at the time of trial or while his attorney is preparing for trial").

these reports as of September 9, 2003, the date on which they were filed with the trial court. Moreover, several of Defendant's ex parte pre-trial motions, upon which the trial court ruled and issued written orders, made specific reference to some of Defendant's head injuries, brain damage, and troubled psychological history. Yet never did defense counsel ask the trial court for funds to investigate Defendant's competence. Never did defense counsel, prior to the sentencing hearing, alert the trial court to any concern that Defendant might not be presently competent.

█ Only once did defense counsel alert the trial court that Defendant's competence might *become* an issue. On November 14, 2003, in the middle of the guilt/innocence phase of the trial, defense counsel filed an ex parte motion for defense services that included the following assertions:

> Defendant requests the authorization of these funds [for Dr. Auble] because should Defendant be found guilty of the crime as charged, his mental condition will be an issue that should be considered by the sentencing jury during the sentencing phase of this case and *the Defendant has indicated he may waive the presentation of mitigating evidence at the sentencing and if he should do so his competency to do so will be called into question.... Further, if [Defendant] chooses to waive the presentation of mitigating evidence, it will be necessary for a mental health expert to assess his mental condition at that time to determine if his history of depression,*

> *coupled with environmental and situational stressors, has affected his mental status.*
>
> . . .
>
> *Because [Defendant] has indicated he may seek to waive mitigation proof at sentencing in this case and if he does so, trial counsel has informed the Court that in an effort to protect [Defendant's] constitutional rights, she will challenge [Defendant's] competency to do so.*

(Emphasis added).[23] In other words, it appears that defense counsel considered Defendant's refusal to put on mitigation proof as a "trigger" regarding his competency. We reject, however, the notion that the decision to waive mitigation proof is, in and of itself, a sufficient indication of incompetency to stand trial as to require a trial court to order sua sponte further inquiry. *See Taylor v. Horn,* 504 F.3d 416, 435 (3rd Cir.2007) (recognizing that defendant's "desire to confess and receive the death penalty as punishment, and refusal to allow witnesses during the penalty phase, are not indications that he was incompetent"); *State v. Cowans,* 87 Ohio St.3d 68, 717 N.E.2d 298, 311 (1999) (rejecting claim that "a trial court must always inquire into the competence of defendants who refuse to present mitigation"); *People v. Grant,* 45 Cal.3d 829, 248 Cal. Rptr. 444, 755 P.2d 894, 912 (1988) (rejecting claim that "a capital defendant's desire for the death penalty in itself suffices to trigger an inquiry into competence"). Furthermore, in spite of defense counsel's assertions in this ex parte pleading, de-

---

**23.** In response to this motion, the trial court entered an order approving the request for expert services. The order includes a finding that Defendant "has indicated that he may seek to waive mitigation proof at sentencing in this case and if he does so, trial counsel has informed this Court that in an effort to protect [Defendant's] constitutional rights, she will challenge [Defendant's] competency to do so." The order also includes a reference to "the evaluation for competency, *if needed.*" (Emphasis added). Clearly, the focus remained on a *potential* request for a competency evaluation, a potential request that was never made.

fense counsel subsequently chose to forego any claim that a competency evaluation was necessary although Defendant did eventually determine to waive mitigation proof. Instead, defense counsel waited until *after* the trial to raise this issue. We can only assume, then, that had defense counsel believed Defendant's competence to stand trial was a genuine issue, they would have brought it to the trial court's attention during the trial. *See State v. Smith*, 993 S.W.2d 6, 15–16 (Tenn.1999) (noting that, if capital defense attorneys had evidence of defendant's incompetence, "we have no doubt that these experienced attorneys would have presented it to the trial court at the jury-out hearing, particularly in light of the trial court's specific questions regarding its existence"). Their professional ethics would have demanded no less and we are not prepared to conclude at this juncture that defense counsel intentionally violated their ethical obligations.

On the record before us, we hold that the trial court did not violate Defendant's constitutional rights by failing to order sua sponte an inquiry into Defendant's competency. We reiterate that defense counsel had the same information prior to trial that it now uses to claim error by the trial court. Under the facts of this case, we will not fault the trial court for failing to order a competency hearing when defense counsel, with full knowledge of the reports' contents, assured the trial court that Defendant *was* competent. Defendant is not entitled to relief on this basis.

### B. Defendant's Waiver

Defendant also argues that his "colloquy with the trial court failed to establish that his waiver of rights in the sentencing hearing was knowing, intelligent and voluntary." We respectfully disagree.

■ This Court has recognized a competent criminal defendant's right to waive the presentation of mitigation evidence at his capital sentencing hearing. *Smith*, 993 S.W.2d at 14; *Zagorski*, 983 S.W.2d at 660. When defense counsel informs the trial court of such a decision,

[t]he trial court must then take the following steps to protect the defendant's interests and to preserve a complete record:

1. Inform the defendant of his right to present mitigating evidence and make a determination on the record whether the defendant understands this right and the importance of presenting mitigating evidence in both the guilt phase and sentencing phase of trial;

2. Inquire of both the defendant and counsel whether they have discussed the importance of mitigating evidence, the risks of foregoing the use of such evidence, and the possibility that such evidence could be used to offset aggravating circumstances; and

3. After being assured the defendant understands the importance of mitigation, inquire of the defendant whether he or she desires to forego the presentation of mitigating evidence.

*Zagorski*, 983 S.W.2d at 660. A trial court's adherence to this procedure "will insure that the accused has intelligently and voluntarily made a decision to forego mitigating evidence." *Id.*

A review of the colloquy between the trial court and Defendant and his lawyers in this case makes clear that the trial court hewed to the *Zagorski* requirements. Indeed, Defendant does not contend otherwise. Rather, Defendant argues that a waiver of the right to present mitigating evidence cannot be intelligent, knowing, and voluntary unless the colloquy includes an explanation that, if a defendant chooses to testify on his own behalf with respect to

mitigating circumstances, the defendant cannot be cross-examined about the facts of the murder unless the defendant himself opens the door. *See State v. Cazes*, 875 S.W.2d 253, 266 (Tenn.1994).

We have previously rejected this argument. *State v. Rimmer*, 250 S.W.3d 12, 29 (Tenn.2008). Defendant has not persuaded us that our decision in *Rimmer* should be changed. Defendant is not entitled to relief on this ground.

### C. Zagorski and Smith

Defendant lastly contends with respect to his waiver that Tennessee's procedure for ensuring the validity of a criminal defendant's waiver of the right to present mitigation evidence is unconstitutional. Defendant specifically attacks *Smith* and *Zagorski*. Indeed, defense counsel ended his oral argument before this Court with the request that we overrule *Zagorski*.

We recognize that *Zagorski* relied, in part, on provisions of the Code of Professional Responsibility ("CPR"). *See Zagorski*, 983 S.W.2d at 658 (referring to Tenn. Sup.Ct. R. 8, EC 7–7 [24] & 7–8 [25]). This Court has since replaced the CPR with the Rules of Professional Conduct ("RPC"). *See* Tenn. Sup.Ct. R. 8 (effective March 1, 2003). The relevant provision of the RPC states that "[i]n a criminal case, the lawyer *shall* abide by the client's decision as to a plea to be entered, whether to waive jury trial, and whether the client will testify." ·Tenn. Sup.Ct. R. 8, RPC 1.2(a) (emphasis added). A client's decision to waive the presentation of mitigation evidence to a jury is encompassed within the decision to waive a jury trial. That decision must, therefore, be respected.

■ A criminal defendant facing the death penalty may waive his or her right to present mitigating evidence so long as the record establishes that the defendant is competent and the waiver is intelligent, knowing, and voluntary. *Zagorski*, 983 S.W.2d at 658–59. The procedure we set forth in *Zagorski* is adequate to allow a trial court to make that determination. We therefore decline Defendant's invitation to overrule *Zagorski*.

In addition to arguing that the *Zagorski* procedure is constitutionally inadequate, Defendant argues that this Court cannot comply with its statutory duty to review Defendant's death penalty, which duty includes that we consider Defendant's nature, in the absence of any mitigation

**24.** "In certain areas of legal representation not affecting the merits of the cause or substantially prejudicing the rights of a client, a lawyer is entitled to make decisions on the lawyer's own. But otherwise the authority to make decisions is exclusively that of the client and, if made within the framework of the law, such decisions are binding on the lawyer.... A defense lawyer in a criminal case has the duty to advise the client fully on whether a particular plea to a charge appears to be desirable and as to the prospects of success on appeal, but it is for the client to decide what plea should be entered and whether an appeal should be taken."

**25.** "A lawyer should exert the lawyer's best efforts to insure that decisions of the client are made only after the client has been informed of relevant considerations.... A lawyer should advise the client of the possible effect of each legal alternative. A lawyer should bring to bear upon this decision-making process the fullness of the lawyer's experience as well as an objective viewpoint. In assisting the client to reach a proper decision, it is often desirable for a lawyer to point out those factors which may lead to a decision that is morally just as well as legally permissible. A lawyer may emphasize the possibility of harsh consequences that might result from assertion of legally permissible positions. In the final analysis, however, the lawyer should always remember that the decision whether to forego legally available objectives or methods because of non-legal factors is ultimately for the client and not for the lawyer."

proof. *See* Tenn.Code Ann. § 39–13–206(c)(1)(D) (2006). We rejected this argument in *Smith. See Smith,* 993 S.W.2d at 13, 14; *see also People v. Ramirez,* 39 Cal.4th 398, 46 Cal.Rptr.3d 677, 139 P.3d 64, 111 (2006) (rejecting contention that "a defendant's decision not to present mitigating evidence at the penalty phase, in itself, renders the determination of penalty unreliable under the federal and California Constitutions").

Defendant contends in his reply brief that *Smith* "was wrongly decided." He asserts that a "[w]aiver of the right to present mitigating evidence by a capital defendant contravenes the mandatory review provisions of T.C.A. § 39–13–206, as well as state and federal constitutional concerns and should be prohibited." In other words, this Court should not permit a competent defendant to decide how he wants his own sentencing hearing to be conducted.

We deem it appropriate here to recite portions of the affidavit defense attorney Green filed in conjunction with Defendant's second amended motion for new trial. She attested the following:

> [Defendant], at different times, offered various explanations for preferring a death sentence over a sentence of life imprisonment: e.g., he didn't want to spend the rest of his life in prison; he would stand a better chance of overturning his conviction in collateral proceedings if he was under a death sentence because death-sentenced inmates received two lawyers and funding for support services; on death row he would not have to share a cell with another inmate and could be by himself; he would not have to deal with prison gangs on death row; he didn't want embarrassing facts about himself or his family to be presented in open court.

It appears to this Court that Defendant gave significant thought to his alternatives. Each of the reasons attorney Green referred to in her affidavit for Defendant's decision to forego the presentation of mitigating evidence has some rational basis and demonstrates a conscious weighing of the pros and cons between the death penalty and life in prison. Yet, Defendant now asks this Court to prohibit this very activity and literally force every capital defendant to endure the presentation of mitigation proof and, concomitantly, his lawyers' pleas for a sentence he may actively—and rationally—want to avoid.

We recognized in both *Zagorski* and *Smith* that "[a]lthough [a defendant] may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the life-blood of the law.'" *Smith,* 993 S.W.2d at 14 (quoting *Zagorski,* 983 S.W.2d at 658 (quoting *Illinois v. Allen,* 397 U.S. 337, 350–51, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (Brennan, J. concurring))). Defense counsel may disagree with their client; indeed, this Court may recognize a defendant's choice in this regard as poor judgment. Nevertheless, this Court will not deprive a defendant, capital or otherwise, of his or her critical choices with respect to his or her trial. The decision about whether to present mitigating evidence is one of those critical choices.

As recognized by the Ohio Supreme Court, "[t]he Eighth Amendment compels no one to present mitigation against his will." *Cowans,* 717 N.E.2d at 310. Accordingly, we reject Defendant's invitation to overrule our decision in *Smith.* Defendant is not entitled to relief on this basis.

## II. Jury Selection

Following completion of jury selection, defense counsel asserted orally that nine

of the State's nineteen peremptory challenges [26] were exercised against minorities for an impermissibly discriminatory purpose.[27] The trial court overruled the objection. Defendant now contends that the trial court's handling of this issue entitles him to a new trial.

 The Equal Protection Clause of the United States Constitution forbids a prosecutor [28] from exercising his or her peremptory challenges to excuse potential jurors on account of their race. *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *State v. Hugueley*, 185 S.W.3d 356, 368 (Tenn.2006). When a defendant alleges that the prosecution is challenging jurors in violation of *Batson*, a three-prong inquiry with a shifting burden of production ensues. The first prong requires the defense to establish a prima facie case of purposeful discrimination. The defense may satisfy this requirement by pointing to a disproportionate number of peremptory strikes directed at minority venire persons. *See Miller–El v. Cockrell*, 537 U.S. 322, 331, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). If the trial court determines that the defense has made out a prima facie case of impermissible discrimination, the second prong places on the prosecution the burden of producing a race-neutral explanation for its challenges. *Batson*, 476 U.S. at 97, 106 S.Ct. 1712; *Hugueley*, 185 S.W.3d at 368. "This explanation must be a clear and reasonably specific account of the prosecutor's legitimate reasons for exercising the challenge . . . [but] need not be persuasive, or even

plausible." *Hugueley*, 185 S.W.3d at 368. The trial court may deem the reason offered to be race-neutral unless a discriminatory intent is inherent in the prosecution's explanation. *Id.*

 If the prosecution offers a race-neutral explanation for its challenges, the third prong requires the trial court to determine, "from all of the circumstances, whether the defendant has established purposeful discrimination." *Id.; see also Snyder v. Louisiana*, —— U.S. ——, 128 S.Ct. 1203, 1208, 170 L.Ed.2d 175 (2008) ("[I]n reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted."). "The trial court may not simply accept a proffered race-neutral reason at face value but must examine the prosecutor's challenges in context to ensure that the reason is not merely pretextual." *Hugueley*, 185 S.W.3d at 368. "If the trial court determines that the proffered reason is merely pretextual and that a racial motive is in fact behind the challenge, the juror may not be excluded." *Id.* at 369.

 As this Court has previously noted, "determination of the prosecutor's discriminatory intent or lack thereof turns largely on the evaluation of the prosecutor's credibility, of which the attorney's demeanor is often the best evidence." *State v. Smith*, 893 S.W.2d 908, 914 (Tenn. 1994). Credibility judgments lie peculiarly within a trial judge's realm. *Hernandez v. New York*, 500 U.S. 352, 365, 111 S.Ct.

---

**26.** The trial court seated four additional jurors in this case. Tennessee Rule of Criminal Procedure 24 provides for fifteen peremptory challenges in a capital case plus one for each additional juror. *See* Tenn. R.Crim. P. 24(e)(1) & (4).

**27.** Defense counsel subsequently filed a written motion raising its *Batson* objection which names the nine venire persons excluded by

the prosecution allegedly on the basis of their minority ethnicity.

**28.** The defense is likewise forbidden from exercising its peremptory challenges for an impermissibly discriminatory purpose. *Georgia v. McCollum*, 505 U.S. 42, 59, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992).

1859, 114 L.Ed.2d 395 (1991) (plurality opinion). We therefore give great deference to a trial court's findings in this regard and will not set them aside unless they are clearly erroneous. *Hugueley*, 185 S.W.3d at 369; *see also Snyder*, 128 S.Ct. at 1207, 128 S.Ct. 1203 (recognizing that "[o]n appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous"). Accordingly, "[t]he trial judge must carefully articulate specific reasons for each finding on the record, i.e., whether a prima facie case has been established; whether a neutral explanation has been given; and whether the totality of the circumstances support a finding of purposeful discrimination." *Woodson v. Porter Brown Limestone Co.*, 916 S.W.2d 896, 906 (Tenn.1996).

▬ In this case, the defense did not object to the exclusion of jurors as they were being rejected but instead lodged its *Batson* objection at the conclusion of all peremptory challenges.[29] Defense counsel simply stated, "I'm going to make a—in essence, a *Batson* challenge. By my count one, two, three, four, five, six, seven, eight, nine of the State's nineteen challenges were minorities, so." Thus, the defense alleged that nine of the prosecution's nineteen peremptory challenges, or 47 percent, were directed at members of minority ethnic groups.[30] The trial court then asked

for the State's response. One of the prosecutors answered,

I can answer the question—the answer to the question, because it's the same [with] regard to every jury; that the juror was stricken because they were equivocal rather than unequivocal regarding their answers regarding the death penalty. Those would be the issues that we looked at, the issue that was at least paramount when the jury was first selected.

The trial court noted that four of the jurors selected to serve were African–American, and two of them "were two of the very first ones placed in the jury box." The court then ruled, "in this type of case, as much time as we've spent on [the death penalty], of course, this Court recognizes as a race neutral reason and I'll overrule your motion for the *Batson* challenge."

We stressed in *Hugueley* that a trial court should make comprehensive findings in response to a *Batson* challenge, articulating its conclusions with respect to each of the three *Batson* prongs and its reasons therefore. *Hugueley*, 185 S.W.3d at 371. We also recognize, however, that this trial was held prior to our decision in *Hugueley*. Nevertheless, we take this opportunity to reiterate the requirement that trial courts respond specifically and completely to each *Batson* prong in turn in order to allow adequate appellate review. As the Su-

**29.** A *Batson* challenge should be made prior to accepting the jury and prior to the jury's being sworn. *State v. Peck*, 719 S.W.2d 553, 555 (Tenn.Crim.App.1986). Delaying a *Batson* challenge until all peremptory challenges have been exercised, however, may prove problematic. In this case, for instance, the jury was sequestered. Had the trial court ruled in Defendant's favor on his *Batson* challenge, one of its possible remedies would have been to recall the improperly challenged jurors. *See Batson*, 476 U.S. at 100 n. 24, 106 S.Ct. 1712; *Woodson*, 916 S.W.2d at 906–07. Since some of them had been excused a sig-

nificant period of time prior to Defendant making his *Batson* challenge, there may have been a risk of exposure to inappropriate information about the case. We therefore encourage counsel to raise *Batson* challenges earlier rather than later. We also encourage trial courts to adopt procedures that will allow the recall of improperly challenged jurors with a minimum of risk and delay.

**30.** Specifically, defense counsel stated that the prosecution excused seven African–Americans, one East Indian, and one Hispanic.

preme Court has recognized, "[t]he trial court has a pivotal role in evaluating *Batson* claims." *Snyder*, 128 S.Ct. at 1208.

Here, the *Batson* challenge was based simply on the prosecution's exercise of 47 percent of its peremptory challenges against venire persons of an ethnic minority. Of course, if 47 percent of the jury pool against which these challenges were exercised consisted of ethnic minorities, no prima facie case based solely on statistics would have been made out. The trial court made no specific finding with respect to whether the defense made out a prima facie case, however; it simply turned to the State and asked for its response.

The record does not contain the jury questionnaires or the notes maintained by counsel (or the trial judge) with respect to juror selection. The Rule 12 data report[31] prepared by the trial court indicates that 50 to 75 percent of the population of the county from which the jury was selected was Caucasian, the same race as Defendant. At least 25 percent of the population from which the venire was selected was therefore of a minority ethnicity (assuming that the county's registered voters reflect a similar ethnic distribution). The Rule 12 data report also indicates that 6 of

the 16 jurors selected for Defendant's trial were non-Caucasian, or 37.5 percent. From a purely statistical standpoint, then, Defendant's jury reflected favorably the overall population from which his jury was selected.[32]

In addition to the Rule 12 data report, the State filed a response to Defendant's motion for new trial in which it asserted that, in addition to the four African–Americans remaining on the jury after it exercised its challenges, one American Indian and one Caucasian/American–Indian remained on the jury. The State also asserted that "it exercised nine (9) peremptory challenges against Caucasians." The trial court referred to this responsive pleading in its order denying Defendant's motion for new trial and stated, "This court continues to be satisfied with the race neutral basis provided by the state as to each challenge of a minority juror. Under all the circumstances, this court finds that its initial ruling was correct and that no *Batson* error is supported by the record."[33]

Thus, the record reflects that the State exercised nineteen peremptory challenges, nine of which were used to eject Caucasians and which left sitting as jurors four African–Americans and two other jurors of

---

31. *See* Tenn. Sup.Ct. R. 12 § 1.

32. In *Miller–El v. Cockrell,* the Supreme Court conducted a "comparative analysis of the venire members" to conclude that the prosecution excluded African–Americans "in a ratio significantly higher than Caucasians were." 537 U.S. at 331, 123 S.Ct. 1029. Specifically, the Court noted that there were 108 possible jurors of which 20 were African–American. Nine of this 20 were excused for cause or by agreement of the parties. The prosecution thereafter exercised 10 of its fourteen peremptory strikes against the remaining eleven African–Americans. Thus, "[o]n this basis 91% of the eligible black jurors were removed by peremptory strikes. In contrast the prosecutors used their peremptory strikes against just 13% (4 out of 31) of the eligible

nonblack prospective jurors qualified to serve on petitioner's jury." *Id.* The record before us does not contain the level of statistical detail utilized by the Supreme Court.

33. Our references to pleadings and orders filed after the conclusion of Defendant's trial should not be construed as approval of a litigant's or the trial court's delay in placing this information in the record regarding a *Batson* objection. The information we have gleaned from these post-trial documents should have been provided in conjunction and contemporaneously with the *Batson* objection and the trial court's ruling thereon. We turn to the post-trial documents here because the record is otherwise devoid of the information helpful to our review of this issue.

minority ethnicity. While we do not hold that the trial court erred in proceeding as if the defense had made out a prima facie case of purposeful impermissible discrimination, we point out that, under the circumstances of this jury pool, and with nothing other than a few statistics to guide us, the prima facie showing was weak, at best.

Turning to the second prong of the *Batson* inquiry, the race-neutral reason offered by the prosecution rested on the challenged jurors' responses to questions regarding the death penalty, which the prosecution described as "equivocal rather than unequivocal." We agree with the trial court that this is a race-neutral reason that contains no inherent discriminatory intent, thereby requiring analysis under the third *Batson* prong.

 Under the third prong, the party raising the *Batson* objection bears the burden of persuading the trial court that the other party has engaged in purposeful and impermissible discrimination. *Batson,* 476 U.S. at 93, 106 S.Ct. 1712 (holding that the party objecting to a peremptory challenge bears the ultimate burden of establishing purposeful discrimination). In this case, the defense asserts that, regardless of any equivocation the challenged jurors may have expressed about the death penalty, each of these jurors also made unequivocal statements that they would follow the law in setting any punishment. The defense then argues that "[e]vidence of purposeful discrimination is found by comparing the [challenged] jurors' unequivocal responses with the actually equivocal responses given by non-minority juror [N.D.],[34] who the prosecution did not challenge, and who ultimately sat on the case." *See Miller–El v. Dretke,* 545 U.S. 231, 241, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (recognizing

that disparate treatment of potential jurors who responded similarly to similar questions may indicate impermissible discrimination where the only significant difference between the prospective jurors is their race).

In light of this argument, we have reviewed the voir dire of each of the six challenged jurors identified in Defendant's brief to this Court. R.J. stated, "I do not believe in the death penalty." D.R.-M. said, "I personally do not believe on [sic] [the death penalty]." L.C. stated, "I do not believe in the death penalty." S.G. said, "I'm morally opposed to the death penalty." G.M. asserted that the punishment for murdering a police officer should not be greater than that for murdering other victims. C.M. explained that her younger sister's boyfriend had been convicted of murder; that whether the death penalty was appropriate depended on the manner in which the victim was murdered; that she would consider a defendant's background in deciding which punishment to impose; and that she "[did not] think [she] would like to [sit on this jury]."

 We have also reviewed the voir dire of N. D., the sole unchallenged juror identified by the defense in its brief in support of its allegation of purposeful discrimination. The defense contends that her responses were equivocal because she stated that she "felt like" and "thought" that she could impose the death penalty. At no time, however, did N.D. express any specific opposition to, or trouble with, the death penalty. *Cf. Snyder,* 128 S.Ct. at 1211–12 (finding prosecutor's expressed reason for challenging black juror pretextual where two white jurors who made similar responses were not challenged). The defense has missed the mark as to the

**34.** In order to shield the privacy of the individual jurors who served on the sequestered jury in this capital case, we use each juror's initials instead of his or her full name.

challenged jurors. Although these jurors stated unequivocally in subsequent voir dire that they could follow the law, including instructions regarding the death penalty, all but C.M. had also indicated some specific belief demonstrating some actual opposition to the death penalty as it would be applied in this case. "[A] juror's reservations about the death penalty may constitute a legitimate explanation for the State's exercise of a peremptory strike." *Hugueley*, 185 S.W.3d at 375. While we respect each challenged juror's expressed commitment to following the law, we also respect the prosecution's concern with these jurors' personal beliefs, which are in opposition to what the law would have required them to do. Thus, while the challenged jurors' specific responses to questions regarding their willingness to follow the law were unequivocal and likely prevented their being dismissed for cause, their seating as jurors would have required them to work in opposition to their own beliefs. The prosecution's expressed concern with these jurors' equivocation was therefore supported by these jurors' responses during voir dire.[35]

At the third prong of a *Batson* inquiry, "the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Hernandez*, 500 U.S. at 365, 111 S.Ct. 1859. Our review of the record convinces us that the trial court did not err in believing the prosecution's explanation for its peremptory challenges. In sum, the totality of the circumstances does not support a finding of purposeful discrimination by the prosecution in exercising its peremptory challenges. We therefore affirm the trial court in overruling Defendant's *Batson* ob-

jection. Defendant is not entitled to relief on this issue.

### III. Jury Instruction on Residual Doubt

■■ Defendant complains that the trial court committed reversible error in failing to instruct the jury on residual doubt during the sentencing phase of his trial. The State asserts that any error was harmless.

Residual doubt evidence refers to proof that the defendant did not commit the murder and that, notwithstanding the jury's verdict of guilt, may raise some lingering or residual doubt in the jury's mind about the defendant's culpability and which may act as a mitigating circumstance with respect to punishment. *See Franklin v. Lynaugh*, 487 U.S. 164, 188, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (O'Connor, J., concurring) (" 'Residual doubt' is not a fact about the defendant or the circumstances of the crime. It is instead a lingering uncertainty about facts, a state of mind that exists somewhere between beyond a reasonable doubt and absolute certainty."); *State v. Hartman*, 42 S.W.3d 44, 57 (Tenn.2001) ("By definition, residual doubt is established by proof that casts doubt on the defendant's guilt."). In this case, the defense adduced two types of residual doubt evidence: (1) proof that Chattin killed the victim and (2) proof that Defendant was elsewhere at the time of the killing.

■■ The Supreme Court has held that the federal constitution does not require a trial court to instruct a capital sentencing jury about residual doubt. *Franklin*, 487 U.S. at 174–75, 108 S.Ct. 2320. Nor does

---

**35.** The final challenged juror did not express a specific opposition to the death penalty. She did, however, express specific reluctance to sit on Defendant's jury and explained that her sister's boyfriend had been convicted of murder. While the prosecution did not specify its reason for striking this particular juror, her expressed aversion to serving on Defendant's jury was tantamount to an equivocal response.

the Tennessee Constitution require a jury instruction on residual doubt. *See State v. Odom,* 928 S.W.2d 18, 30 (Tenn.1996); *State v. Hutchison,* 898 S.W.2d 161, 174 (Tenn.1994).

 The admission of, and instruction on, residual doubt evidence does have a statutory basis in Tennessee, however. Our capital sentencing statute provides that

> evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection [39–13–204](i); and any evidence tending to establish or rebut any mitigating factors.

Tenn.Code Ann. § 39–13–204(c) (2003). Further, the statute requires the trial court to charge the sentencing jury with "instructions for the jury to weigh and consider any mitigating circumstances raised by the evidence at either the guilt or sentencing hearing, or both, which shall include, but not be limited to, those circumstances set forth in subsection (j)." *Id.* at (e)(1). Subsection 39–13–204(j) provides:

> In arriving at the punishment the jury shall consider, [pursuant to the provisions of this section], any mitigating circumstances which shall include, but are not limited to, the following: ... (9)[a]ny other mitigating factor which is

raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing.

Based upon these statutory provisions,[36] this Court has determined that a capital sentencing jury should be instructed on residual doubt when it is raised by the evidence and requested by the defendant. *See State v. Thomas,* 158 S.W.3d 361 app. 402–03 (Tenn.2005). We review a trial court's erroneous failure to instruct on residual doubt under a harmless error standard. *Id.* at 403.

As noted above, the defense adduced residual doubt evidence during the guilt phase of Defendant's trial. Moreover, the defense filed a proposed jury instruction requesting the jury be charged that it "may consider as mitigation any evidence presented in the first phase of the trial or in the sentencing phase which suggests that notwithstanding the verdict of guilt, there is some residual doubt as to [Defendant's] guilt." Accordingly, the trial court erred in this case by failing to instruct the jury on residual doubt.

 Although the trial court did not deliver a specific instruction on residual doubt, it did instruct the jury as follows:

> In arriving at this determination [of which sentence to impose], you are authorized to weigh and consider any of the statutory aggravating circumstances proved beyond a reasonable doubt, and any mitigating circumstances which may have been raised by the evidence throughout the entire course of this trial, including the guilt-finding phase or sentencing phase or both.

---

**36.** Subsection (j) sets forth several explicit mitigating factors (such as the defendant acted under "extreme duress") followed by the "catch-all" mitigating factor set forth at (j)(9). This Court has referred to mitigating factors other than those explicitly defined as "nonstatutory" mitigating factors. *See, e.g., Odom,*

928 S.W.2d at 31. This is a misnomer, as the catch-all provision is part of the statute. We will hereafter refer to those mitigating factors that fall within the "catch-all" provision as "unspecified mitigating factors." Residual doubt is an unspecified mitigating factor.

. . .

Mitigating circumstances. Tennessee law provides that in arriving at the punishment, the jury shall consider, as previously indicated, any mitigating circumstances raised by the evidence which shall include, but are not limited to, the following: One, any mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing; that is, you shall consider any aspect of the defendant's character or record or any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence.

The defendant does not have the burden of proving a mitigating circumstance.

. . .

Mitigation is defined for you as that which tends to soften, temper, or make less harsh or severe. Thus, mitigating circumstances surrounding a criminal offense are those circumstances which tend to lessen the apparent badness of the particular crime in question or the apparent badness of the particular defendant.

■■■ "A charge should be considered prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges,* 944 S.W.2d 346, 352 (Tenn.1997). If, however, "[b]y their breadth, the instructions on [unspecified] mitigating circumstances encompassed all the evidence presented by the defense," *id.* at 356, the trial court's failure to instruct on residual doubt is harmless. *State v. Ivy,* 188 S.W.3d 132, 156 (Tenn.2006).

We hold that the instructions given by the trial court in this case were sufficiently broad and encompassing "to give the jury the opportunity and duty to consider any residual doubts about [Defendant's] culpa-

bility." *Thomas,* 158 S.W.3d app. at 403–04; *see also Ivy,* 188 S.W.3d at 156. Thus, the trial court's failure to give a specific residual doubt instruction was harmless error and does not entitle Defendant to a new trial.

■■■ Defendant argues that our holding of harmless error will eliminate the possibility of reversible error resulting from the omission of a residual doubt instruction in any case so long as the "catch-all" instruction is given. We disagree and point out that this Court may consider only the alleged errors that are before it. Under the facts and circumstances of this case, we hold that the trial court's error in failing to give a specific residual doubt instruction was harmless. We do not predict that such a failure will always be harmless whether or not the catch-all instruction is provided to the jury. We caution trial courts, however, that the better practice is to give a requested instruction on residual doubt in those cases in which it is properly raised. *Thomas,* 158 S.W.3d app. at 403 (recognizing that "where the issue of residual doubt is raised by the evidence, a jury instruction is appropriate").

Defendant also argues that Tennessee Code Annotated section 39–13–204(e)(1) is unconstitutional. This statutory language provides that "a reviewing court shall not set aside a sentence of death or of imprisonment for life without the possibility of parole on the ground that the trial court did not specifically instruct the jury as to a requested mitigating factor that is not enumerated in subsection (j)." Defendant argues that this portion of the capital sentencing law violates the Tennessee Constitution's provisions for separation of powers, *see* Tenn. Const. art. II, § 1, and unconstitutionally deprives him of a remedy for the violation of his rights, *see id.* art. 1, §§ 8 & 17. Because we have found

that the trial court's error in failing to deliver the residual doubt instruction was harmless, we need not address the constitutional efficacy of subsection (e)(1).

Defendant is not entitled to relief on this basis.

## IV. Limitations on Hunt and Chattin Testimony

Defendant alleges that the trial court erred by not allowing Tina (Chattin) Hunt to testify that she had had an affair with Defendant while she was married to Mike Chattin. He also alleges that the trial court further erred in limiting his cross-examination of Chattin about a protective order that Hunt had obtained against Chattin. Defendant argues that this testimony should have been admitted because it was the defense theory that Chattin killed the victim and framed Defendant out of anger and jealousy after Hunt left Chattin in April 2001. Defendant also submits that further cross-examination about the protective order could have established Chattin's animosity toward the police.

### A. Tina (Chattin) Hunt

■ On voir dire examination prior to testifying before the jury, Tina Hunt testified that she had worked with Defendant over 15 years earlier. At that time, and while she was married to Chattin, she and Defendant had an affair. Hunt stated that Chattin not only knew about the affair but encouraged it. The prosecution objected to this evidence. The trial court ruled that it was "not relevant, it's remote in time" and prohibited its introduction before the jury. Defendant complains that the trial court's ruling was erroneous.

■ Our Rules of Evidence provide that relevant evidence is generally admissible while irrelevant evidence is not. Tenn. R. Evid. 402. Relevant evidence is that which has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. We review a trial court's decision regarding the admissibility of evidence under an abuse of discretion standard. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn.2008). We agree with the Court of Criminal Appeals that the trial court did not abuse its discretion in ruling inadmissible Hunt's testimony about an affair she had with Defendant 15 years earlier. The defense was proffering this proof as evidence of Chattin's animosity toward Defendant and desire to frame Defendant for the victim's murder. Given the length of time that had passed since the affair, during which Chattin and Hunt remained married; Hunt's testimony that Chattin encouraged the affair; her explanation that she eventually left Chattin because of his mental, physical and drug abuse; and the friendly relationship that had since ensued between Chattin and Defendant, including the time period at which the murder was committed; we agree with the trial court that this proof was simply not probative of the point the defense desired to make. *See Haun*, 695 S.W.2d at 550 (recognizing that whether lapse of time affects relevance/admissibility of proffered evidence depends upon whether there remains a rational connection between the two events). Defendant is not entitled to relief on this issue.

### B. Mike Chattin

■ Defendant also complains in his brief to this Court that the trial court

"limited [his] cross-examination of Chattin regarding the contents of a protective order that Ms. Hunt had taken out against him." Defendant failed to cite to any portions of the record in support of this claim of error. Additionally, after Chattin's voir dire prior to cross-examination, the trial court ruled that it would not allow the defense to ask about the contents of the protective order and defense counsel responded, "Okay." For both of these reasons, Defendant has waived this issue. *See* Tenn. R.App. P. 27(a)(7) (requiring briefed arguments to include "appropriate references to the record"); Tenn. R.App. P. 36(a) (providing that appellate court need not grant relief where complaining party "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error").

■ This issue is, moreover, without merit. The trial court allowed Hunt to testify concerning Chattin's conduct which provided the basis for her seeking the protective order. There was also a significant amount of testimony about Chattin's reactions to the protective order. The actual contents of the protective order were not relevant to any issue with respect to Defendant's guilt of the crimes charged in this case. The trial court did not abuse its discretion in making this evidentiary ruling. Defendant is not entitled to relief on this basis.

## V. Exclusion of Phone Call and Memorandum

Defendant also complains about the exclusion of other evidence. In August 2003, Public Defender Ardena Garth received an anonymous telephone call from a man who said that Defendant did not kill the victim and that the killers were "[t]he witness and another black guy" whose nickname was "D Train." The caller claimed to have "a tape of Mike Chattin telling me that

when he got home, that night, that [Defendant] was in the bed" and that Chattin and his girlfriend "rode around for a while and got their story together and the girlfriend is lying." He explained that the killing arose out of "a drug deal went bad." The caller also explained that he had worked with Tennessee Bureau of Investigation Agent Joe Copeland and "set Mike Chattin up on a cocaine deal." When he asked Agent Copeland why Chattin had not been arrested on the drug deal, Copeland allegedly told the caller that "the homicide detective told [Copeland] to stand down." The caller claimed to have a tape recording of this conversation, also. The caller, claiming that he was being pressured to keep this information quiet, told Garth he would give her the tapes before trial. He never did.

The defense sought to introduce a tape recording of the phone call between Garth and the anonymous caller. The defense also proffered testimony from two persons who had listened to the tape of the call and identified the caller as Mack Heard. The State stipulated that these two persons would so testify.

The defense also sought to introduce a handwritten memorandum dated January 7, 2002, which reflected a meeting between Agent Joe Copeland and other law enforcement officers during which Copeland informed the others that Chattin was interested in trading a Corvette and guns for cocaine. Copeland testified during a jury-out hearing that he had obtained this information from Mack Heard. Copeland explained that Heard was working undercover to assist him in setting up a cocaine sale to Chattin. Copeland also testified during that hearing that Heard never told him that Chattin confessed to murdering the victim. The trial court acknowledged, and the State stipulated, that Heard was unavailable to testify.

## A. Phone Call

■ With respect to the tape recording of the phone call, the defense argued that the caller's statements were admissible as a statement against penal interest pursuant to Tennessee Rule of Evidence 804(b)(3). The trial court rejected this argument, a ruling Defendant contends was erroneous.

Tennessee Rule of Evidence 804(b)(3) provides for an exception to the hearsay rule where the declarant is unavailable and the declarant's statement

> was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

The defense argues that the phone call to Garth placed the caller at risk for prosecution for the federal crime of misprision of a felony. *See* 18 U.S.C.A. § 4. Defendant also argues that the phone call placed the caller at risk of prosecution for conspiracy to obstruct justice under Tennessee Code Annotated section 39–12–103(e)(1) (2003). The trial court ruled that, because the caller did not identify himself, he could not have understood that his statements to Ms. Garth placed him at risk of prosecution; his statements therefore lacked the underlying indicia of reliability upon which Rule 804(b)(3) is based. The question of whether and to what extent an anonymous declarant can make a statement against interest that is admissible under Rule 804(b)(3) is an issue of first impression before this Court.

As a general matter, hearsay evidence is not admissible. Tenn. R. Evid. 802.

> In the Anglo–American legal system, hearsay evidence has traditionally been excluded because of a fear that it is unreliable. By definition, hearsay involves an out-of-court statement used in court to prove the truth of the matter asserted in the out-of-court statement. The primary concern is that the trier of fact will not be able to hear cross-examination of the declarant, who made the out-of-court hearsay statement. In addition, the hearsay declarant's statement is presented to the trier of fact, but the declarant often is not present and therefore not subject to the oath to tell the truth. Another concern is that, since the trier of fact will not be able to observe the demeanor of the declarant, it will be difficult to assess the accuracy of the declarant's statement.

Neil P. Cohen et al., *Tennessee Law of Evidence* § 8.01(3)(a) (5th ed.2005) (footnote omitted); *see also State v. Brown*, 29 S.W.3d 427, 431 (Tenn.2000) (recognizing that "[g]enerally speaking, the rule against hearsay is considered to be a rule of reliability"). Where sufficient indicia of reliability are present, however, hearsay may be admissible:

> For example, the excited utterance hearsay exception exists because the declarant is viewed as unlikely to be insincere when making a statement under stress. The presence of stress minimizes the risk of insincerity. Even though ... other ... risks remain, the lack of a substantial sincerity problem means that a statement that is an excited utterance is traditionally deemed sufficiently reliable to be heard by the trier of fact.

Cohen, *supra* § 8.01(3)(c) (footnote omitted); *see also State v. Henry*, 33 S.W.3d 797, 801 (Tenn.2000) (recognizing that exceptions to the hearsay rule exist where the hearsay statements "bear sufficient indicia of reliability and trustworthiness to warrant admission").

A statement against penal interest is deemed sufficiently reliable to constitute an exception to the hearsay rule because

a reasonable person similarly situated to the declarant would not have made the statement unless the reasonable person believed it was true. In turn, this statement means that a reasonable declarant would have realized it was against his or her interest. The important time is when the statement was made.

Rule 804(b)(3) does not specifically provide that the declarant must have personally known that the statement was against his or her interests when it was made. However, this knowledge is the reason the hearsay statement is viewed as sufficiently reliable to be admitted, and *the evidence should not be admitted if it is established that the declarant did not know that the statement was harmful.*

Cohen, *supra* § 8.36(5) (emphasis added). In other words, the actual fear of punishment reasonably held by a confessing perpetrator is assumed to be overridden by some other concern of such magnitude that it renders the confession reliable.

Given the rationale underlying the 804(b)(3) exception, it is not surprising that courts considering the admissibility of an *anonymous* statement against penal interest have concluded that such statements are not admissible. *See, e.g., Clark v. Optical Coating Lab., Inc.,* 165 Cal.App.4th 150, 80 Cal.Rptr.3d 812, 833 (2008), and cases cited therein; *United States v. Burks,* 36 M.J. 447, 451 n. 2 (C.M.A.1993) (stating that "we are at a loss to understand how it may logically be concluded that the *anonymous* writer of a self-incriminating letter has made any statement that truly is against the writer's penal interests"); *State v. Tucker,* 331 N.C. 12, 414 S.E.2d 548, 555 (1992) (providing that in order for a hearsay statement to be

admissible under the exception for statements against penal interest, the statement "must actually subject the declarant to criminal liability" and that "[a]n anonymous letter does not satisfy this element because a declarant who conceals his identity does not tend to expose himself to criminal liability"); *Commonwealth v. Lewis,* 472 Pa. 235, 372 A.2d 399, 403 (1977) (holding inadmissible an anonymous statement against penal interest because "an anonymous statement subjects no one to any responsibility and, therefore, the key to the reliability—that someone could himself suffer by this statement—is absent"); *see also State v. Wilhoit,* 962 S.W.2d 482, 487 (Tenn.Crim.App.1997) (recognizing that information provided by an anonymous citizen "raises heightened concerns about the reliability of the information" because of the possibility of false reports or reports from vindictive or unreliable informants). As pointed out by the North Carolina Supreme Court, an anonymous message

is not a declaration against interest because the declarant is unknown. In order for a statement to be a declaration against interest, the statement must expose the declarant to criminal liability. Rule 804(b)(3) (1988). Where the declarant conceals or hides his identity the statement does not tend to expose him to criminal liability because he is unknown. Under circumstances where the declarant is unknown, the circumstantial guarantee of reliability is absent because persons may make untrue statements that would be damaging to themselves where they conceal their identity. It is only where the identity of the declarant is revealed in the statement that the guarantee of reliability arises. The statement must actually subject the declarant to criminal liability. Without knowledge of the identity of the declar-

ant, the statement does not subject declarant to criminal liability.

*State v. Artis,* 325 N.C. 278, 384 S.E.2d 470, 484–85 (1989), vacated on other grounds, *Artis v. North Carolina,* 494 U.S. 1023, 1023, 110 S.Ct. 1466, 108 L.Ed.2d 604 (1989). We agree with the reasoning of these cases.

The defense argues that "in this day and age, it is foreseeable that one's telephone calls to public agencies would be tape-recorded and captured on caller-ID, and that, as happened in this case, someone would later come forward and identify the caller through familiarity with his or her voice." Even if this argument has some merit, we are not persuaded that it changes our analysis. Caller–ID may (or may not) identify the phone number from which a call is being placed; it does not identify who is speaking into the phone, however. And if the caller thinks that his call may be recorded and that his voice may then be subjected to efforts at identification, he may simply attempt to disguise his voice in some manner. He may also be convinced for other reasons that his voice will remain unidentified. In all of these events, the anonymous caller will likely lack the crucial concern that he will be called to answer for his statements: otherwise, he would not take efforts to conceal his identity in the first place.

Finally, we agree with the Court of Criminal Appeals that there is an additional reason that the anonymous phone call was not admissible as a statement against penal interest. The caller told Ms. Garth that he could not let an innocent man go to jail. He also told her that he had been pressured to keep his information quiet. Obviously, he was presenting himself as an ally in the pursuit of justice. As commentators have noted, statements should not be admitted under Rule 804(b)(3) "if the declarant actually believed that he or she

was saying something that would be helpful." Cohen, *supra* § 8.36(5). In that event, "reliability is questionable and the statement should not be admitted under this hearsay exception." *Id.*

In sum, we agree with the trial court and the Court of Criminal Appeals that the anonymous phone call was not admissible as a statement against penal interest. The trial court committed no error in this regard.

■ Defendant also argues with a single sentence in his brief to this Court that "the tape [recording of the anonymous phone call] should have been admitted as extrinsic proof of a prior inconsistent statement," citing Tennessee Rule of Evidence 613. That Rule provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Tenn. R. Evid. 613(b). Prior inconsistent statements may be admissible only for the purpose of impeachment and not as substantive evidence. *See State v. Martin,* 964 S.W.2d 564, 567 (Tenn.1998). Since defense counsel asked Chattin on cross-examination whether he ever told anyone that he killed the victim, and Chattin denied having done so, Defendant apparently believes that Rule 613 applies.

Even if the defense were offering Chattin's alleged statements to the anonymous caller as impeachment evidence only, thereby rendering them nonhearsay, there remains a hearsay obstacle to its admissibility. The extrinsic evidence of Chattin's alleged statements consists of the out-of-court declarations of the anonymous caller. To be relevant, the anonymous caller's declarations would have to be accepted for their truth—that Chattin told him thus-

and-so. The extrinsic evidence is therefore hearsay. *See* Tenn. R. Evid. 801(c). We have already determined, however, that the anonymous caller's declarations are not admissible under the hearsay exception for statements against penal interest. Defendant does not argue that they are otherwise admissible as an exception to the hearsay rule. Defendant therefore has no mechanism for admitting Chattin's allegedly inculpatory statements because they are cloaked in inadmissible hearsay. Accordingly, Chattin's alleged statements are not available for use as prior inconsistent statements under Rule 613.

### B. Handwritten Memorandum

Defendant contends that the trial court also erred in refusing to admit the handwritten notes made in conjunction with the meeting between Agent Copeland and others. Defendant argues that this document should have been admitted as a business record pursuant to Tennessee Rule of Evidence 803(6).

Our Rules of Evidence provide for the admission of written hearsay

> made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness.

Tenn. R. Evid. 803(6).

Defendant asserts in his brief to this Court that the memorandum was written by Agent Copeland. Agent Copeland testified, however, that the handwriting was not his. He did not identify the author. Thus, the document at issue consists of handwritten notes by an unidentified person reflecting information gathered by

Agent Copeland from confidential informant Heard. The record is devoid of proof sufficient to establish that the document is a business record as required by Rule 803(6). This issue is without merit.

### C. Right to Present a Defense

Finally, Defendant contends that the trial court's exclusion of the tape recording and the handwritten memorandum violated his constitutional right to present a defense, relying on *Brown*, 29 S.W.3d at 433–34. In *Brown*, this Court recognized that "[t]he Sixth Amendment and the Due Process Clause of the Fourteenth Amendment clearly guarantee a criminal defendant the right to present a defense which includes the right to present *witnesses* favorable to the defense." *Id.* at 432 (emphasis added). We also recognized in *Brown*, however, that a defendant's right to present witnesses is not absolute. *Id.* Rather, "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). And while "the hearsay rule may not be applied mechanistically to defeat the ends of justice," *id.*, it also may not be given short shrift. Rather, any otherwise inadmissible hearsay evidence sought to be admitted on due process grounds must, among other things, bear "sufficient indicia of reliability." *Brown*, 29 S.W.3d at 433–34.

We have already concluded that the excluded tape recording and handwritten memorandum do not bear "sufficient indicia of reliability." Indeed, the excluded evidence bears absolutely *no* indicia of reliability. The phone call occurred almost two years after the victim's death. The caller refused to identify himself but pur-

ported to be a drug dealer. He claimed to have tape recordings that he said he would deliver to the Public Defender but failed to do so. He claimed to have set Chattin up for arrest, revealing a mindset averse to Chattin's interests. As to the memorandum, its authorship was never identified or authenticated.

In sum, this case is distinguishable from *Brown*, in which this Court held that, where a criminal defendant is attempting to present relevant and *reliable* hearsay that is critical to the defense, the rule against hearsay must yield. *Id.* at 436. The hearsay sought to be introduced by the defense in this case was in no way reliable. Accordingly, the trial court did not err in excluding it. Defendant is not entitled to relief on this basis.

### VI. Sufficiency of the Evidence

■ The jury convicted Defendant of one count of first degree premeditated murder, one count of first degree felony murder perpetrated in conjunction with a theft, and one count of first degree felony murder perpetrated in conjunction with attempted arson. Defendant contends that the evidence is not sufficient to support these convictions.

■ When evaluating the sufficiency of the evidence, we must determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In making this determination, we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom. *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). Questions concerning the credibility of the witnesses, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the trier of

fact. *Id.* Because a verdict of guilt removes the presumption of innocence and imposes a presumption of guilt, the defendant upon conviction bears the burden of showing why the evidence is insufficient to support the verdict. *State v. Rice,* 184 S.W.3d 646, 661 (Tenn.2006); *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn.1982).

First degree premeditated murder is the unlawful and intentional killing of another with premeditation. Tenn.Code Ann. § 39–13–202(a)(1) (1997). A premeditated killing is one done "after the exercise of reflection and judgment." *Id.* at (d). Further,

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.*

■ "Premeditation may be inferred from the manner and circumstances of the killing." *Finch v. State,* 226 S.W.3d 307, 318 (Tenn.2007). Circumstances which will support a finding of premeditation include the accused's threats or declarations of an intent to kill; the procurement of a weapon; lack of provocation by the victim; the particular cruelty of a killing; the infliction of multiple wounds; failure to aid or assist the victim; calmness after the killing; and the destruction or secretion of evidence of the killing. *Banks,* 271 S.W.3d at 139; *State v. Leach,* 148 S.W.3d 42, 53–54 (Tenn.2004); *Bland,* 958 S.W.2d at 660. A jury may also infer premeditation from proof of the accused's

motive to kill the victim. *Leach,* 148 S.W.3d at 54; *State v. Nesbit,* 978 S.W.2d 872 app. 898 (Tenn.1998).

Defendant argues that the proof is not sufficient to prove that he killed Deputy Bond with premeditation. We disagree. Taken in the light most favorable to the State, the proof demonstrated that Defendant felt mistreated by the police and had come to "despise" them. On the afternoon of September 5, 2001, he took his assault rifle to Mike Chattin's house. That night, after Chattin and Carol Bishop had gone to bed, Defendant drove Chattin's truck to Nunley's fruit stand with the intention of burning it down. He poured fuel around the area and tried to light it without success. When Deputy Bond arrived in his patrol car and got out, presumably to investigate, Defendant shot him multiple times with his assault rifle. Defendant took the victim's sidearm and may have shot Deputy Bond with that, as well. After the victim was dead, Defendant removed the front part of the victim's bulletproof vest. Defendant tried to leave the scene in Chattin's truck but was unable to get it started. Defendant then tried to leave in the victim's patrol car but was unable to get it into gear. Defendant returned to Chattin's truck, got it started, and returned to Chattin's house, where he calmly confessed his crimes to Chattin. In an attempt to conceal physical evidence, Defendant later threw into Chattin's backyard the bulletproof vest, the victim's sidearm, and the clothing and boots he wore during the murder.

These circumstances, supported by physical proof and testimony, entitled the jury to find that Defendant killed Deputy Bond intentionally and with premeditation. Defendant is not entitled to relief on this issue.

With respect to Defendant's first degree felony murder convictions, we adopt the sufficiency analysis undertaken by the Court of Criminal Appeals and set forth in the attached appendix.

## VII. Mandatory Review

When a defendant has been sentenced to death, we must conduct a mandatory review of the sentencing process pursuant to Tennessee Code Annotated section 39–13–206(c)(1) (2006). That provision of our criminal code requires us to determine whether: (a) the death sentence was imposed in any arbitrary fashion; (b) the evidence supports the jury's finding of statutory aggravating circumstances; (c) the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances; and (d) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. *Id.*

### A. *Imposition of Death Penalty*

Defendant argues that his death sentence was imposed in an arbitrary fashion because the trial court: (1) failed to excuse for cause two jurors who had "close personal ties with law enforcement"; and (2) erroneously admitted evidence of Defendant's animosity toward the police. We will first address Defendant's contentions regarding the jury.

■■■ E.C. testified on voir dire that he had a sister who was a deputy police officer in Memphis, as well as several friends in law enforcement including one who was a Chattanooga police officer. He stated that these relationships would not affect his ability to serve on the jury and that he could give Defendant a fair trial. He did not know anything about the case other than what he had read in his juror questionnaire; he had not talked to his friend on the Chattanooga police force "in years." He stated that he would base his decisions

on the evidence that was presented to him and that he would consider all of the possible punishments if a sentencing phase was necessary. After further questioning, defense counsel stated, "I read your questionnaire, and listened to your questions, we think you're a good juror for both the State of Tennessee, [Defendant] and this State." Accordingly, defense counsel did not request that E.C. be excused for cause. By the time E.C. was tentatively seated on the jury, the defense had exhausted all of its peremptory challenges.

D.V. indicated on her juror questionnaire that "Someone killing an officer of the law should receive a tougher sentence to send a message to other felons the police should be protected as our protectors." She affirmed this sentiment during voir dire. She also stated that a first cousin with whom she was "very close" was a homicide detective in Ohio and that they talked about his work. As to the death penalty, D.V. explained that, as a Catholic, she was opposed to the death penalty until she began following the Paul Dennis Reid case. She explained that the high number of victims in that case caused her to support the death penalty under those circumstances. D.V. asserted unequivocally that, although this case involved the murder of a police officer, she would not automatically assume Defendant's guilt but would listen to the evidence. She would not convict Defendant unless the State proved its case. If the jury convicted Defendant, she would remain open-minded about the possible sentences and would not automatically support the death penalty. She would consider mitigating evidence. During voir dire by defense counsel, she acknowledged that, given her relationship with her first cousin and her opinions regarding police officers, someone in Defendant's position would probably not be "happy" to have her on a jury. In re-

sponse to defense counsel's question of whether she "really might be prejudiced" such that her ability to serve on the jury was affected, D.V. responded, "I hope I would—wouldn't be prejudiced, that I would listen to—to all the—to, you know ... I'm an honest person and I would hope I would be open enough to listen to all the evidence. You know, I just can't say anymore than that." The court then asked D.V. the following:

> If you got back in the jury room and it was time for you to make a decision as to the sentence in this case ... and you started thinking about this and the way you feel about police officers, could you put that aside and say, well, uh—here's what the Judge said to do, this is the law, and I've got to follow the law in this case. Would your willingness to follow the law and apply the law, would that override any feelings that you have?

D.V. responded, "Absolutely." Although the defense had many peremptory challenges remaining at the time D.V. was tentatively seated on the jury, it did not use one to remove her. Nor did defense counsel attempt to have D.V. removed for cause.

Defendant contends that the trial court "should have sua sponte excused [E.C.] and [D. V] for cause" and that its failure to do so renders the death sentence imposed in this case impermissibly arbitrary. We disagree.

In 1972, the Supreme Court concluded that an arbitrarily imposed death penalty violated the Eighth Amendment to the United States Constitution. *Furman v. Georgia*, 408 U.S. 238, 239–40, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (per curiam). Four years later, the Court decided that the Eighth Amendment is not violated by a death penalty imposed pursuant to procedures that substantially reduce the risk of

arbitrariness. *Gregg v. Georgia*, 428 U.S. 153, 195, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Tennessee's procedures for imposing the death penalty have passed constitutional muster. *See State v. Shepherd*, 902 S.W.2d 895, 907 (Tenn.1995).

Defendant has cited us to no authority supporting his contention that the failure to excuse jurors E.C. and D.V. rendered his death penalty "arbitrary" in the sense addressed by Tennessee Code Annotated section 39–13–206(c)(1)(A). We assume he means that these two jurors caused the jury to impose the death penalty for an impermissible reason, to wit, their alleged bias in favor of harsh punishment for killers of law enforcement officers. The record does not support this conclusion, however. To the extent that either E.C. or D.V. expressed any potential bias relevant to this case, each was rehabilitated; indeed, defense counsel expressed verbal approval of E.C.'s qualifications to serve as a juror. Defense counsel made no attempt to have either of these jurors excused for cause; clearly, any concern about their alleged bias did not develop until after the death sentence had been rendered.

Defendant makes much of the fact that the only aggravating circumstance in this case is the victim's status as a law enforcement officer, rendering doubly dangerous these jurors' alleged bias in favor of the harshest punishment available. Although not stated explicitly, the actual thrust of Defendant's argument is that any juror having a sympathetic relationship with someone similar to the victim of a capital murder, and where the aggravating circumstance relates to the victim's status, should be banned from participating on the jury. For instance, one of the aggravating circumstances upon which the death penalty may be imposed is where the defendant is at least eighteen years old and the victim is under twelve years old. Tenn.Code Ann. § 39–13–204(i)(1). Should all parents be prohibited from serving on the jury in a capital case where that is the only aggravating circumstance at issue? We do not think the Eighth Amendment goes so far. We reject Defendant's contention that the retention of jurors E.C. and D.V. rendered his death penalty impermissibly arbitrary.

■ Defendant also alleges that his death sentence was imposed arbitrarily because, during the guilt-innocence phase, the trial court admitted into evidence testimony that Defendant had a negative attitude toward law enforcement officers. Headley testified that Defendant told him, "if I could kill somebody, I will, even if I have to sneak up on them and do it." Headley explained that Defendant made this statement in the context of his return to Tennessee to handle some problems that had arisen from an earlier altercation with the police. Hankins testified that Defendant told him that if a police officer tried to take him (Defendant) into custody, Defendant "would kill a man before he would ever take a beating like he took before." Attorney Anderson read one of Defendant's responses to interrogatories that included the statement, "I've grown to despise the police and feel that they are crooked."

The trial court did not err by admitting this testimony because it was relevant to establishing Defendant's motive with respect to the first degree premeditated murder charge. Defendant's motive was *not* at issue with respect to the aggravating circumstance alleged by the State during the sentencing phase of the trial. Prior to the jury retiring to make its sentencing decision, the trial court instructed it that

> Tennessee law provides that no sentence of death or sentence of imprisonment for life without possibility of parole shall be imposed by a jury but upon a unanimous

finding that the State has proven beyond a reasonable doubt the existence of one or more of statutory aggravating circumstances, which shall be limited to the following, counts One, Two and Three: One, the murder was committed against any law enforcement officer, corrections official, corrections employee, emergency medical or rescue worker, emergency medical technician, paramedic, or firefighter, who was engaged in performance of official duties and the defendant knew or reasonably should have known that such victim was a law enforcement officer, corrections official, corrections employee, emergency medical or rescue worker, emergency medical technician, paramedic, or firefighter, engaged in the performance of official duties.

Members of the jury, the court has read to you the aggravating circumstances which the law requires you to consider if you find proved beyond a reasonable doubt. *You shall not consider any other facts or circumstances as an aggravating circumstance in deciding whether the death penalty or imprisonment for life without possibility of parole would be appropriate punishment in this case.*

(Emphasis added). Thus, the jury was properly instructed not to consider Defendant's motive in conjunction with determining whether the State had established that the death penalty was appropriate to consider as a punishment. The jury is presumed to follow its instructions. *Banks,* 271 S.W.3d at 134.

Defendant has cited us to no authority for the notion that a death penalty has been imposed arbitrarily and in violation of the Eighth Amendment where the jury heard negative testimony about the defendant during the guilt-innocence phase that it was subsequently instructed to ignore during the penalty phase. Again, we do not think the Eighth Amendment goes so far.

In sum, we hold that the sentencing phase of Defendant's trial was conducted pursuant to the procedure established in the applicable statutory provisions and rules of criminal procedure. We reject Defendant's arguments that the death penalty was imposed arbitrarily and conclude that the death penalty was not imposed in an arbitrary fashion. Defendant is not entitled to relief on this basis.

### B. Sufficiency of Aggravating Circumstance

We turn now to the sufficiency of the evidence supporting the jury's finding of the statutory aggravating circumstance. In this case, the jury determined that the State had proven beyond a reasonable doubt a single aggravating circumstance: that the murder was committed against a law enforcement officer engaged in the performance of his official duties, and Defendant knew or reasonably should have known that the victim was a law enforcement officer engaged in the performance of official duties. *See* Tenn.Code Ann. § 39–13–204(i)(9). We review the evidence supporting this aggravating circumstance in the light most favorable to the State and determine whether a rational trier of fact could have found its existence beyond a reasonable doubt. *State v. Bane,* 57 S.W.3d 411, 426 (Tenn.2001).

The proof established that Defendant drove to Nunley's fruit stand during the night of September 5th in order to burn it down. While Defendant was trying to start the fire, uniformed Hamilton County Deputy Sheriff Donald Bond drove up in his marked patrol car. Deputy Bond got out of his patrol car, leaving it running and with its headlights on. While Deputy Bond was walking near a pick-up truck parked in the area, Defendant shot him

several times with an assault rifle, at least once at very close range. After Deputy Bond was down on the ground, Defendant ripped part of Deputy Bond's bulletproof vest off of his body and took the officer's service weapon. Defendant then tried to drive off in Deputy Bond's patrol car.

This evidence is more than sufficient to establish the aggravating circumstance beyond a reasonable doubt.

## C. Aggravating Circumstance Outweighs Mitigating Circumstances

■■■ After the jury convicted Defendant of all three counts of first degree murder, the trial court questioned Defendant about his decision regarding the presentation of proof of mitigating circumstances. Defendant stated that he did not want his lawyers to present any proof of mitigating circumstances. Furthermore, Defendant chose not to testify on his own behalf during the sentencing phase. Accordingly, the defense presented no proof during the sentencing phase of Defendant's trial of any mitigating circumstances that might counteract the State's proof of the aggravating circumstance. Proof in the nature of mitigating circumstances presented during the guilt phase of Defendant's trial was about injuries Defendant alleged that other police officers had inflicted on him as well as proof supporting residual doubt. We conclude that the State's proof of the aggravating circumstance was sufficient for the jury to conclude that the aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt.

## D. Proportionality

■■■ We turn now to our analysis of whether the sentence imposed in this case is excessive or disproportionate to the penalty imposed in similar cases. This review identifies aberrant, arbitrary, or capricious sentencing by determining whether the death sentence is " 'disproportionate to the punishment imposed on others convicted of the same crime.' " *Bland,* 958 S.W.2d at 662 (quoting *Pulley v. Harris,* 465 U.S. 37, 42–43, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984)). We begin with the presumption that a death sentence is proportional with the crime of first degree murder. *State v. Hall,* 976 S.W.2d 121, 135 (Tenn.1998). In conducting this review, we employ the precedent-seeking method of comparative proportionality review, in which we compare this case with other cases involving similar defendants and similar crimes. *Bland,* 958 S.W.2d at 665–67. While no defendants or crimes are identical, a death sentence is disproportionate if a case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." *Id.* at 668. Our inquiry, however, does not require a finding that "a sentence less than death was never imposed in a case with similar characteristics." *Id.* at 665. This Court has repeatedly held that the pool of cases considered by this Court in its proportionality review includes "those first degree murder cases in which the State seeks the death penalty, a capital sentencing hearing is held, and the sentencing jury determines whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death." *Reid,* 164 S.W.3d at 316.

■■■ In reviewing the applicable pool of cases, we consider

numerous factors regarding the offense: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and

(9) the injury to and effect upon non-decedent victims.

*Id.* In addition, we consider "numerous factors about the defendant: (1) prior criminal record [or activity]; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation." *Id.* at 316–17; *see also Bane*, 57 S.W.3d at 428–29.

In this case, Defendant drove someone else's vehicle to Nunley's fruit stand late at night, wearing dark clothing and armed with an assault rifle. His intention was to commit arson. When Deputy Bond pulled up in his patrol car, Defendant waited until Deputy Bond was out of his vehicle and in the open before shooting him repeatedly with his assault rifle. Once Deputy Bond was down, Defendant ripped a portion of Deputy Bond's bulletproof vest from his body and took his service weapon. Defendant attempted to leave the scene first in Chattin's truck and then the victim's patrol car when he had trouble starting the truck. Unable to get the patrol car into gear, Defendant eventually fled in the truck. Defendant returned to Chattin's house where he disposed of the evidence he had gathered at the crime scene. He gloated to Chattin about killing Deputy Bond. He tried to resist his arrest and has shown no remorse for his crimes. The jury determined that Defendant murdered the victim with premeditation, a determination we have upheld. There was neither provocation nor justification for the killing. The victim was thirty-five years old, married, and on active duty as a law enforcement officer when he was killed.

Defendant is Caucasian and was thirty-one years old at the time he murdered Deputy Bond. He is divorced with no children. He has prior convictions for assault, possession of drug paraphernalia, possession of a weapon, and resisting arrest.[37]

This Court has upheld other death sentences under comparable circumstances and where the jury has applied the (i)(9) aggravating circumstance. In *State v. Henderson*, 24 S.W.3d 307 (Tenn.2000), the defendant murdered a deputy by shooting him in the back of the head during an escape attempt. While incarcerated, the defendant had his girlfriend smuggle a handgun to him. The defendant then arranged for a visit to the dentist. While awaiting treatment, the defendant pulled the handgun, threatening the dentist and his assistant. The dentist called for help and the deputy, waiting in the reception area, responded. The defendant fired at the deputy, grazing him with a gunshot. The deputy fell and struck his head, rendering him unconscious. The defendant left the treatment room but then returned and fired a shot into the back of the unmoving deputy's head at point blank range, killing him. The defendant escaped but was apprehended a short time later. He pled guilty to first degree premeditated murder and waived a jury as to sentencing. The trial court imposed the death sentence on the basis of four aggravating circumstances, including that the murder was committed against a law enforcement officer who was engaged in the performance of official duties. This Court affirmed the defendant's sentence of death. *Id.* at 310.

In *State v. Workman*, 667 S.W.2d 44 (Tenn.1984), a jury imposed a death sentence on a defendant who shot and killed a

---

**37.** We have gleaned this information from the trial court's report filed pursuant to Tennes- see Supreme Court Rule 12.

police officer following his robbery of a fast-food restaurant. The defendant, who had been apprehended almost immediately after the robbery, broke free from their lawful custody and fired his pistol at them in an attempt to escape. The defendant hit two officers, killing one. The jury applied four aggravating circumstances, including (i)(9). This Court upheld the death sentence. *Id.* at 46.

In *Hugueley,* 185 S.W.3d at 363, the jury imposed the death penalty for the defendant's murder of a corrections counselor. While an inmate at the prison where the victim was working, the defendant approached the unsuspecting victim from behind while concealing a handmade knife and began stabbing him repeatedly. The defendant killed the victim because he felt the victim had "disrespected" him. *Id.* at 384. The jury applied four aggravating circumstances including (i)(9). This Court upheld the death sentence. *Id.* at 387.

In *Taylor,* 771 S.W.2d at 392, the jury imposed the death penalty for the defendant's murder of a prison guard. While an inmate at the facility where the victim was working, the defendant approached the victim from behind as the victim was talking to some other inmates, grabbed him, and began stabbing him repeatedly with a prison-made knife. The defendant killed the victim because he believed the victim had treated him unfairly. The jury applied four aggravating circumstances including (i)(9). This Court upheld the death sentence. *Id.* at 401.

We recognize that each of these cases involved more than one aggravating circumstance. Only one is necessary for imposition of the death penalty, however. *State v. Moore,* 614 S.W.2d 348, 351–52 (Tenn.1981). And while our statute does not assign relative significance or wicked-

ness to the various statutory aggravating circumstances, this Court has determined that "[b]y their very nature, and under the proof in certain cases, ... some aggravating circumstances may be more qualitatively persuasive and objectively reliable than others." *State v. Howell,* 868 S.W.2d 238, 261 (Tenn.1993). In *Howell,* this Court determined that the aggravating circumstance for prior violent felony convictions [38] was one of these "more qualitatively and objectively reliable" aggravating circumstances. *Id.* The aggravating circumstance in this case is similar to the prior violent felony aggravating circumstance in that it also consists of objective factors that are readily ascertainable. Moreover, the proof in this case of the aggravating circumstance is overwhelming. Accordingly, we are not troubled by the comparison of this case with others that involved more than one aggravating circumstance.

We have reviewed the circumstances of this case in comparison with these similar cases and many others not herein detailed and conclude that the death penalty imposed by the jury in this case is not excessive or disproportionate. Defendant is not entitled to relief on this ground.

## VIII. Lethal Injection Protocol

In his final issue, Defendant contends that Tennessee's method of execution by lethal injection is unconstitutional because the protocol currently in use constitutes cruel and unusual punishment. We disagree.

This Court upheld Tennessee's three-drug lethal injection protocol in *Abdur'Rahman v. Bredesen,* 181 S.W.3d 292, 297–98 (Tenn.2005). We rejected another challenge to the protocol in *State v. Banks,* 271 S.W.3d 90, 160 (Tenn.2008). The Su-

---

**38.** Presently codified at Tennessee Code Annotated section 39–13–204(i)(2).

preme Court has held that Kentucky's three-drug lethal injection protocol passes constitutional muster. *Baze v. Rees*, 533 U.S. ——, 128 S.Ct. 1520, 1538, 170 L.Ed.2d 420 (2008). Tennessee's protocol is "substantially similar" to Kentucky's. *Banks*, 271 S.W.3d at 160 n. 66; *see also Henley v. Little*, No. 3:08–1148, 2009 WL 211139, at * 1 (M.D.Tenn. Jan.26, 2009).

We recognize that a federal district judge has held that Tennessee's lethal injection protocol is unconstitutional. *See Harbison v. Little*, 511 F.Supp.2d 872, 903 (M.D.Tenn.2007), *appeal docketed*, No. 07–6225 (6th Cir. Oct. 11, 2007). That decision is not controlling, however, and bears little weight in light of its pending appeal and the subsequent Baze case.

Defendant is not entitled to relief on this basis.

## CONCLUSION

In accordance with Tennessee Code Annotated section 39–13–206(c)(1) and the principles adopted in prior decisions, we have considered the entire record in this case and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the jury's finding that the aggravating circumstance outweighs any mitigating circumstances beyond a reasonable doubt, and that the sentence is not excessive or disproportionate.

We have reviewed all of the issues raised by Defendant and conclude that they do not warrant relief. With respect to issues that were raised in this Court but not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals.[39] Relevant portions of that opinion are incorporated herein and attached as an appendix. Defendant's convictions and sentence of death are affirmed. This matter is remanded to the trial court for entry of a single judgment of conviction of first degree murder.

The sentence of death shall be carried out as provided by law on the 19th day of May, 2010, unless otherwise ordered by this Court or other proper authority. It appearing that Defendant Marlon Duane Kiser is indigent, the costs of this appeal are taxed to the State of Tennessee.

## APPENDIX

(Excerpts from the Decision of the Court of Criminal Appeals)

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

April 24, 2007 Session

STATE OF TENNESSEE v. MARLON DUANE KISER

Direct Appeal from the Criminal Court for Hamilton County No. 238279 Stephen M. Bevil, Judge

NORMA McGEE OGLE, J., delivered the opinion of the court, in which JERRY L. SMITH and D. KELLY THOMAS, JR., JJ., joined.

Brock Mehler (at trial and on appeal) and Peter D. Heil (on appeal), Nashville, Tennessee, and Karla G. Gothard (at trial), Mary Ann Green (at trial), Howell G. Clements (at trial), and Hugh J. Moore (at

---

39. In rejecting Defendant's argument that he is entitled to a new trial because the jury was instructed that "reasonable doubt does not mean a doubt that may arise from possibility," the Court of Criminal Appeals properly concluded that the challenged instruction did not violate Defendant's due process rights. Since the Court of Criminal Appeals issued its opinion in this case, this Court has expressly disapproved of this instruction and discouraged its further use. *See Rimmer*, 250 S.W.3d at 31. We confirm this disapproval today.

trial), Chattanooga, Tennessee, for the appellant, Marlon Duane Kiser.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Mark E. Davidson, Assistant Attorney General; William H. Cox, District Attorney General; and Barry A. Steelman, Executive Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### [Section II]

### A. Impartial Jury

The appellant claims that the trial court erred by refusing to excuse two jurors, [W.M.] and [T.P.], for cause because the jurors were incompetent. He asserts that the trial court's error forced him to exhaust his peremptory challenges to remove the jurors, which in turn permitted two other allegedly incompetent jurors, [E.C.] and [D.V.], to serve on the jury, violating his right to a fair and impartial jury. The State responds that the challenged jurors either stated during voir dire that they could be impartial or were rehabilitated and that the trial court did not err by refusing to excuse them.

During jury voir dire, prospective juror [W.M.] acknowledged that on his juror questionnaire, he had answered that he believed the death penalty is an appropriate form of punishment in all murder cases. When the trial court asked him if he could consider life and life without the possibility of parole as possible punishments for a first degree murder conviction, [W.M.] acknowledged that he could also consider imposing those punishments. Upon questioning by the defense, [W.M.] stated that everyone facing a murder charge "should be" facing the death penalty. He said that he had the long-standing belief in the "eye for an eye" theory of justice and that a person who killed someone should be killed in return. At first, [W.M.] stated that he did not think he could impose a life sentence for someone convicted of murder. However, he later stated that he could consider a life sentence if the law provided that a defendant would serve at least fifty-one years before becoming eligible for parole. [W.M.] said that he would be able to consider punishments other than death in this case even if the State proved the appellant's guilt and the existence of an aggravating circumstance and that he did not believe such factors as a defendant's bad childhood or age should be considered during sentencing. However, he stated that he would follow the law and consider all options, including mitigating factors, that the trial court instructed him to consider. Upon questioning by the State, [W.M.] stated that executions ought to be televised but that he had no problem following the law. The defense moved to have [W.M.] removed for cause, but the trial court refused. The defense argued that "he's saying that he could not consider . . . mitigating factors. We make our objection based on that." The trial court overruled the objection.

According to the appellant, prospective juror [T.P.] "twice reaffirmed" during voir dire his belief that if the appellant were convicted of first degree murder, the appellant should receive the death penalty and that this was the only appropriate punishment. The appellant complains that [T.P.] only stated he would follow the law and consider all possible punishments in response to leading questions from the trial court. Explaining why he believed the appellant should receive the death penalty if found guilty of first degree murder, [T.P.] stated, "I mean, they don't—they're not anymore deserving of life than someone else; the person that they took."

However, he said that a defendant's background of abuse or neglect "would have to be taken in consideration," but probably would not make the death penalty inappropriate. In addition, he said a defendant's mental problems or issues "wouldn't really matter." In the following exchange, [T.P.] further explained to defense counsel his view on the appropriateness of the death penalty if the appellant were convicted in this case:

> Q: Correct. So, essentially, you're saying that if he were found guilty of that you think that that would be the only appropriate punishment?
>
> A. I do. I feel like that that's laid out by the law as to what the punishment would be—
>
> Q: Uh-huh.
>
> A. —based on the facts and the evidence that was shown or given.
>
> Q: Uh-huh.
>
> A. So, I do have faith in the justice system, so I think if that's what was the applicable punishment, then yeah, I—
>
> Q: Okay.
>
> A. —feel strongly about that.

[T.P.] stated that he believed death was the appropriate punishment for first degree murder "[i]f that's what the law shows." Upon questioning by the trial court, [T.P.] said he did not understand that not every first degree murder case was a death penalty case. He said that in his earlier response, his "understanding wasn't as clear about the law itself" and that he "absolutely" would be willing and able to consider and weigh mitigating factors against an aggravating circumstance and to consider life and life without parole as possible sentences based on the proof. The trial court overruled the appellant's challenge of [T.P.] for cause, stating that "by his answers [he] seemed to be a very

fair juror and willing to listen to all the evidence before making any decision, and ... weighing all the mitigators as well as the aggravating circumstances in this case."

The appellant complains that the trial court's refusal to excuse [W.M.] and [T.P.] for cause forced him to use peremptory challenges to excuse the prospective jurors and resulted in his accepting jurors [E.C.] and [D. V.]. He asserts that both [E.C.] and [D.V.] were incompetent to serve on the jury because of their close personal ties to law enforcement.

[E.C.] testified that his sister was a deputy in Memphis, that a friend was an officer in the Chattanooga Police Department, and that other friends were in law enforcement. He said the fact that this case involved a deputy's death would not affect his ability to serve on the jury or give the appellant a fair trial. He said he had not talked with his friend in Chattanooga about the case, that he could consider all of the available sentences, and that he "would base [his decision about the punishment] on what is presented ... in the case. Exactly." He also stated that he could weigh the aggravating circumstance with the mitigating circumstances. After questioning by the State, the trial court, and the defense, defense counsel told [E.C.], "I read your questionnaire, and listened to your questions, we think you're a good juror for both the state of Tennessee, Mr. Kiser and this State." The record reflects that [E.C.] was moved into the jury box during the peremptory challenge process but after the appellant had already used all of his peremptory challenges. The defense did not request that he be removed for cause.

[D.V.] stated during voir dire that her first cousin was a homicide detective in Ohio. She said they were very close and that he talked to her about his work.

[D.V.] initially stated that she "possibly could be prejudiced" because the victim was a police officer. She later said, however, that she would not go into the case automatically assuming the appellant was guilty or that a certain sentence should be imposed because the victim was a police officer. She said that she would "have to hear the rest of the evidence," that she would be "open-minded," and that she would listen to mitigating evidence before making a decision regarding the appellant's punishment. [D.V.] said she never believed in the death penalty until she began following Paul Dennis Reid's case. She stated that she now believed in the death penalty and acknowledged that she had changed her mind about the death penalty because the Reid case involved several victims and involved a lengthy appeals process.

[D.V.] acknowledged that she agreed with the following statement on her questionnaire form: "Someone killing an officer of the law should receive a tougher sentence to send a message to the felons. The police should be protected because they're our protectors." She testified that her answer did not mean she felt the death penalty for killing a police officer should be automatic. She said that she was Catholic and had held a religious belief that opposed the death penalty but that her view changed after the Reid case. [D.V.] said that if she were on trial for the murder of a police officer, "[i]t probably wouldn't make me happy to have someone like [me] sitting on the jury." She said she hoped she would not be prejudiced and "would be open enough to listen to all the evidence." She said her willingness to follow and apply the law would "absolutely" override any feelings she had. The record reflects that [D.V.] was moved into the jury box after the appellant had exercised

seven out of his nineteen peremptory challenges. The defense did not use a peremptory challenge to remove [D.V.] and did not request that she be removed for cause.

Both the United States and Tennessee Constitutions guarantee a criminal defendant the right to a trial by an impartial jury. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. To that end, parties in civil and criminal cases are granted "an absolute right to examine prospective jurors" in an effort to determine that they are competent. *See* Tenn.Code Ann. § 22–3–101. The "proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment ... is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). "[T]his standard ... does not require that a juror's biases be proved with 'unmistakable clarity.'" *Id.* Instead, the trial court must have the "definite impression" that the prospective juror cannot follow the law. *State v. Hutchison*, 898 S.W.2d 161, 167 (Tenn.1994) (citing *Wainwright*, 469 U.S. at 425–26, 105 S.Ct. at 853). Irrespective of whether the trial judge should have excluded the challenged jurors for cause, any possible error is harmless unless the jury who actually heard the case was not fair and impartial. *State v. Howell*, 868 S.W.2d 238, 248 (Tenn.1993); *State v. Thompson*, 768 S.W.2d 239, 246 (Tenn. 1989). The failure to correctly excuse a juror for cause is grounds for reversal only if the defendant exhausts all of his peremptory challenges and an incompetent juror is forced upon him. *Ross v. Okla-*

*homa,* 487 U.S. 81, 89, 108 S.Ct. 2273, 2279, 101 L.Ed.2d 80 (1988); *State v. Jones,* 789 S.W.2d 545, 549 (Tenn.1990).

Turning to the instant case, although [W.M.] initially was skeptical that he could impose a sentence on a convicted murderer that might allow him to "walk the streets" again, he changed his position after being advised that a life sentence under state law meant that the appellant would serve at least fifty-one years before becoming eligible for parole. He stated that he would follow the law and consider all options, including mitigating factors, that the trial court instructed him to consider. Although [T.P.] initially stated that death was the only proper sentence in a first degree murder case, he later admitted that his view was based on his lack of knowledge about the capital sentencing law and his admittedly mistaken impression that every first degree murder case involved a potential death sentence. [T.P.] said that he "absolutely" would be willing and able to consider and weigh mitigating factors against an aggravating circumstance and that he could consider life and life without parole as possible sentences based on the proof.

In any event, even if the trial court erred by refusing to remove [W.M.] or [T.P.] for cause, the error is reversible only if [E.C.] or [D.V.] were incompetent to serve on the jury. We note that although the record reflects that the appellant used all of his peremptory challenges, he never requested that [E.C.] or [D.V.] be removed from the jury for cause. The appellant argues that the trial court sua sponte should have removed those jurors from the panel. However, as our supreme court has instructed, "A defendant must not only exhaust his peremptory challenges, but he must also challenge or offer to challenge any additional prospective ju-

ror in order to complain on appeal that the trial judge's error in refusing to excuse for cause rendered his jury not impartial." *State v. Irick,* 762 S.W.2d 121, 125 (Tenn. 1988) (citing *Wooten v. State,* 99 Tenn. 189, 41 S.W. 813 (Tenn.1897); *State v. Doelman,* 620 S.W.2d 96, 100 (Tenn.Crim.App. 1981)). Therefore, any complaint regarding the jurors has been waived. *See* Tenn. R.App. P. 36(a) (providing that our rules do not require "relief [to] be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error").

The appellant contends that in the event the issue has been waived, the inclusion of jurors [E.C.] and [D.V.] on the jury constitutes plain error. Tennessee Rule of Criminal Procedure 52(b) provides that this court may address "[a]n error which has affected the substantial rights of an accused . . . at any time, even though not raised in the motion for a new trial . . . where necessary to do substantial justice." *See also* Tenn. R. Evid. 103(d). We may only consider an issue as plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Adkisson,* 899 S.W.2d 626, 641–42 (Tenn.Crim.App.1994) (footnotes omitted); *see also State v. Smith,* 24 S.W.3d 274, 283 (Tenn.2000) (adopting the *Adkisson* test for determining plain error). Furthermore, the " ' "plain error" must be of such a great magnitude that it probably changed the outcome of the trial.' " *Adkisson,* 899 S.W.2d at 642 (quoting *United*

*States v. Kerley,* 838 F.2d 932, 937 (7th Cir.1988)).

The appellant contends jurors [E.C.] and [D.V.] were automatically incompetent to serve on the jury because of their close relationships with law enforcement officers. However, this court has stated that "the alleged relationship of jurors to people connected with law enforcement ... does not give rise to an inherently prejudicial situation in and of itself." *State v. Taylor,* 669 S.W.2d 694, 699 (Tenn.Crim. App.1983). Regarding [E. C.], he stated that his sister was a deputy in Memphis and that he had a friend with the Chattanooga Police Department. He stated that he had not spoken with his friend in Chattanooga about the case and that his sister's being a deputy would not make a difference in this case. Moreover, the defense's statement that [E.C.] would be a "good juror" for the appellant demonstrates that the defense wanted [E.C.] on the panel. Thus, the appellant made a tactical decision not to challenge [E.C.], and he is not entitled to plain error relief.

Turning to juror [D.V.], she expressed concern that she might be biased because of her close relationship with her cousin, an out-of-state homicide detective, and her belief that offenses against law enforcement officers demand harsher punishment. However, upon extensive questioning, [D.V.] maintained that she did not believe a death sentence was automatically warranted when a law enforcement officer was the victim. She stated that she would be "open-minded," that the law would override any feelings she had about a given case, and that she would consider mitigating evidence before making a decision as to the appellant's punishment. She said that after hearing the mitigating evidence, she could impose a sentence of death, life, or life without parole. [D. V.'s] statements "left leeway for rehabilitation" and show

that she had not formed an opinion regarding the appellant's guilt or punishment. *See Cooper v. State,* 847 S.W.2d 521, 535 (Tenn.Crim.App.1992). Moreover, [D.V.] admitted a past opposition to the death penalty. Therefore, the defense's failure to use a peremptory challenge to remove her from the jury, despite ample opportunity to do so, also may be attributed to trial strategy, and the appellant again is not entitled to plain error relief.

**B. Failure to Excuse Jurors for Cause**

In a related issue, the appellant asserts that prospective jurors [W.M.], [T.P.], and [O.J.], should have been removed for cause because their responses during voir dire indicated an unwillingness to consider mitigating factors at sentencing. Although none of these potential jurors served on the jury, the appellant contends that because he was forced to use his peremptory challenges to remove them, other incompetent jurors, including [E.C.] and [D.V.], were forced upon him. As we have concluded, the record does not support the appellant's claim that jurors [E.C.] and [D.V.] were incompetent. Accordingly, the trial court's refusal to excuse [W.M.], [T.P.], and [O.J.] for cause cannot lead to a finding of reversible error. Moreover, the record reveals that during voir dire, each of these prospective jurors stated that they could follow the law as instructed and could consider and weigh mitigating factors. The appellant is not entitled to relief on this issue.

**D. Pretrial Hearing on Expert Opinion Testimony**

The appellant argues that the trial court erred by denying his motion requesting a pretrial hearing to determine the admissibility of the State's proposed scientific expert testimony. The appellant concludes that all of the expert testimony was admit-

ted in violation of the Tennessee Rules of Evidence and the procedures outlined in *McDaniel v. CSX Transportation,* 955 S.W.2d 257 (Tenn.1997), because the reliability and trustworthiness of the underlying scientific evidence was not determined. The State responds that the appellant has waived any objection to the introduction of the expert testimony because he failed to object to its introduction at trial. The State further contends that through his cross-examination of the State's expert witnesses, the appellant essentially challenged the weight of the expert testimony rather than its admissibility. For this reason, the State concludes that a pretrial *McDaniel* hearing would not have changed the outcome of the trial. We conclude that the appellant is not entitled to relief.

The record reflects that the appellant initially sought a hearing regarding proposed expert testimony in the areas of gunshot residue, footprint comparison, and microscopic fiber comparison. At a June 6, 2003 motions hearing, the defense expanded its request to include expert testimony regarding DNA, ballistics tests, fingerprint analysis, blood spatter analysis, bullet trajectory analysis, and crime reconstruction analysis. Defense counsel explained that it was seeking a pretrial hearing on "any and all expert testimony the State would intend to present." Defense counsel asserted that although general acceptance and a history of admissibility of certain types of scientific evidence were among the relevant factors for a court to consider, they did not end the inquiry. Counsel reasoned that under *McDaniel,* "if there's an expert that's going to give an opinion based on, quote/unquote, scientific evidence, or novel evidence, then there has to be a determination that it is relevant, that it's reliable, and the Court needs to conduct this kind of hearing to make sure

that it's certainly admissible." Counsel argued that although expert testimony on these different types of scientific evidence had been introduced in other cases, the trustworthiness and reliability of the evidence had not been challenged in those cases. The defense concluded by stating that "we're asking that we have a hearing date set at another time. And we had specifically said we would not ask for specific hearings on each individual issue today."

The trial court expressed reluctance to have the requested hearing, stating as follows:

So without some showing, some perfunctory showing to say that there is some reason to question the scientific validity or reliability of these tests, I think it's a little broad. To say, Well, we want the fingerprint test, we want [the] ballistics test, we want the microbiologic test, we want the serology test, we want every one of these tests now to be criticized, without some threshold showing of unreliability, I think is—I'm just not ready to do that, I don't think that's necessary.

The ones that there is a threshold or some reason to subject that test, or a test that hasn't been accepted, and these are, they've been accepted over and over and over again, and I know that in and of itself doesn't mean that it is valid and it can't be contested, but just to say we want every one of these tests, we feel like every one of these tests now, all of a sudden, now should be subjected and we want that done, I think that's a little broad.

I'll be glad to put this over and give both [parties] an opportunity to present any other authority or any other bases for subjecting those tests to the Daubert standard, I'll be glad to entertain that

and give the State time to respond to that.

The trial court stated that it would announce on August 13 whether it would hold a "Daubert hearing." According to an August 13, 2003 minute-entry, the trial court overruled the appellant's motion for a hearing.

The record reflects that each of the State's expert witnesses testified at trial without objection. We briefly set forth the testimony of these witnesses:

James Russell Davis, II, testified that he had been employed as a special agent forensic scientist in the microanalysis section of the TBI laboratory for twenty-two years. He stated that he had analyzed gunshot residue tests for seven years. He detailed his education, training, and experience and stated that he had testified as an expert over one hundred fifty times in various courts. After explaining what gunshot residue is and how it is collected and analyzed, Davis testified about the test results taken from the appellant, the victim, and others in this case. He said that the victim's test was "inconclusive," that Carol Bishop's and Mike Chattin's tests were "negative," and that the appellant's test was "positive" for the presence of elements indicative of gunshot residue. As to the appellant, Davis explained that the result indicated the appellant "could have fired, handled, or was near a gun when it was fired," while the others' results could not "eliminate the possibility that the individual could have fired, handled, or was near a gun when it was fired." Davis said gunshot residue tests cannot determine whether a person actually fired a gun, but were often used as an investigative tool for determining whether a particular person should be further investigated.

Oakely W. McKinney testified that he was a special agent forensic scientist with the TBI. He stated that he had thirty-four years of experience working with latent fingerprints, had conducted "possibly millions" of fingerprint comparisons, and had testified as an expert hundreds of times. McKinney explained that latent fingerprints referred to prints that are recorded or left behind accidentally. He explained that certain conditions are required to leave a latent print and that they are fragile by nature. McKinney said fingerprints recovered from the driver's door and rear panel of a Dodge pickup truck belonged to the appellant.

Teri Arney, a forensic scientist with the TBI, testified that she worked in firearms identification to identify the weapons from which bullets and cartridge cases were fired. Arney testified about her education and training and noted that she had testified about forty times as an expert. She said she test-fired the appellant's rifle and examined eight shell casings recovered from the crime scene and concluded that all eight cases had been fired from the appellant's rifle. Three 7.62 caliber bullets recovered from the victim's body were also fired from the appellant's rifle. Arney further determined that all three .40 caliber cartridge casings recovered at the scene had been fired from the victim's weapon.

Linda Littlejohn, another forensic scientist with the TBI, testified that she worked in the microanalysis section of the TBI laboratory. She said she specialized in shoe print, fiber, and physical comparisons and described her education, training, and experience. Littlejohn said that she had testified about seventy-five times as an expert witness. After explaining how shoe print and fiber comparisons are made, Littlejohn said that a left boot found beneath Mike Chattin's deck matched a partial boot print found at the crime scene. Littlejohn said she also compared fibers

and concluded that fibers in vacuumings of the victim's driver's seat were consistent with fibers found on a sweat jacket.

Amy Michaud testified that she was employed as a hair and fiber analyst in the Trace Evidence Unit at the FBI in Virginia. She said she performed hair analysis and found that a pubic hair found on the sweat jacket she examined was "microscopically similar" to the sample provided by the appellant and that two head hairs taken from a t-shirt were microscopically similar "with slight differences" to the appellant's head hair samples. She explained that microscopic hair analysis can be used to narrow the source of a hair to a small part of the population. With respect to fibers, Michaud explained that it was not "positively identifiable evidence" because of the fact that fibers are mass-produced. She said her analysis showed that fibers recovered from the victim's patrol car were microscopically similar to fibers taken from the t-shirt and sweat pants.

Laura Hodge testified that she worked at the TBI in the Microanalysis Section of the crime laboratory. In her work, she performed fire debris analysis and could detect the presence of "gasoline-range products," including all automobile fuels on clothing and in soil samples. She said her testing revealed the presence of gasoline-range product on a soil sample taken from under the black pickup truck found parked at the crime scene as well as on the boots, sweat jacket, t-shirt, and pants recovered from beneath the balcony of Mike Chattin's home.

Any evidence offered by an expert witness must satisfy the general test of relevancy; that is, it must tend to prove an issue that is material to the determination of the case. *See* Tenn. R. Evid. 401, 402. The admission of expert testimony is governed by Tennessee Rules of Evidence 702 and 703. Rule 702 provides that "[a] witness who is qualified as an expert in a particular field may testify in the form of an opinion if the scientific, technical or other specialized knowledge of the witness will substantially assist the trier of fact in understanding evidence or determining a fact at issue." Tenn. R. Evid. 702; *see McDaniel v. CSX Transp., Inc.,* 955 S.W.2d 257 (Tenn.1997). Rule 703 provides that expert testimony shall be disallowed "if the underlying facts or data indicate lack of trustworthiness." Tenn. R. Evid. 703. Taken together, these rules require a trial court to determine "whether the evidence will substantially assist the trier of fact to determine a fact in issue and whether the facts and data underlying the evidence indicate a lack of trustworthiness." *McDaniel,* 955 S.W.2d at 265.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993), the United States Supreme court held that Federal Rule of Evidence 702 requires that a trial court "ensure that any and all scientific testimony ... is not only relevant, but reliable." In *McDaniel,* our supreme court set forth the following list of non-exclusive factors that may be useful to a trial court in determining the reliability of scientific evidence:

A Tennessee trial court *may* consider in determining reliability: (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether, as formerly required by Frye, the evidence is generally accepted in the scientific community; and (5) whether the expert's re-

search in the field has been conducted independent of litigation.

*Id.* (emphasis added).

As explained in *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152–53, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238 (1999),

The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether* that expert's relevant testimony is reliable. Our opinion in *[GE v.] Joiner[,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997),]* makes clear that a court of appeals is to apply an abuse-of-discretion standard when it "reviews a trial court's decision to admit or exclude expert testimony." 522 U.S. at 138–139, 118 S.Ct. 512. That standard applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion. Otherwise, the trial judge would lack the discretionary authority needed both to avoid unnecessary "reliability" proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises. Indeed, the Rules seek to avoid "unjustifiable expense and delay" as part of their search for "truth" and the "just determination" of proceedings. Fed. Rule Evid. 102. Thus, whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine.

It is well-settled that "the allowance of expert testimony, the qualifications of expert witnesses, and the relevancy and competency of expert testimony are matters which rest within the sound discretion of the trial court." *State v. Rhoden,* 739 S.W.2d 6, 13 (Tenn.Crim.App.1987) (citing *Murray v. State,* 214 Tenn. 51, 377 S.W.2d 918, 920 (1964); *Bryant v. State,* 539 S.W.2d 816, 819 (Tenn.Crim.App.1976); *State v. Holcomb,* 643 S.W.2d 336, 341 (Tenn.Crim.App.1982)). This court will not disturb the trial court's ruling absent a clear showing that the trial court abused its discretion in admitting or disallowing expert testimony. *Id.; State v. Stevens,* 78 S.W.3d 817, 832 (Tenn.2002). This court will not find an abuse of discretion unless it " 'appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.' " *Stevens,* 78 S.W.3d at 832 (quoting *State v. Shuck,* 953 S.W.2d 662, 669 (Tenn.1997)).

The trial court's August 13 minutes do not explain why the court denied the appellant's motion requesting a hearing. However, in its June 6 decision to postpone a ruling on the appellant's motion, the court noted that the State's scientific evidence in areas such as blood spatter analysis, fingerprint comparison, and hair and fiber analysis, had been repeatedly admitted in other cases in this state and asked the defense, "[I]sn't that implicitly accepting it as meeting the *[McDaniel]* standards?" The trial court gave the appellant an opportunity to submit briefing as to why such a hearing was warranted in this case and specifically requested that the appellant explain which states had rejected the contested scientific evidence. The defense told the trial court that it would submit a brief on persuasive case law.

On July 14, 2003, the appellant filed a memorandum in support of a pretrial *McDaniel* hearing. However, the memo-

randum was essentially a history of federal and Tennessee case law on the admissibility of scientific evidence, and it failed to cite a single case in which a court in this state or any other state had ruled that the scientific evidence at issue was unreliable or untrustworthy. We note that the appellant also failed to cite any mandatory or persuasive authority at the motion for new trial hearing or in his appellate brief. In our view, the trial court, which requested further briefing from the appellant on this issue, gave the appellant the opportunity he was seeking to show why the scientific evidence at issue was unreliable. The appellant presented not a scintilla of proof that the scientific evidence was untrustworthy or unreliable. Lastly, we observe that the appellant vigorously cross-examined each expert witness and successfully brought to light many limitations of the various tests and test results. We conclude that the appellant is not entitled to relief.

### E. Sufficiency of the Evidence

First degree felony murder is defined as a "killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy." Tenn. Code Ann. § 39–13–202(a)(2). In order for a killing to occur "in the perpetration of" the felony, the killing must be "done in pursuance of the unlawful act, and not collateral to it." *Farmer v. State*, 201 Tenn. 107, 296 S.W.2d 879, 883 (1956). No culpable mental state is required for a felony murder conviction except the intent to commit the underlying felony. Tenn. Code Ann. § 39–13–202(b). "[I]ntent to commit the underlying felony must exist prior to or concurrent with the commission

of the act causing the death of the victim." *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999). "Proof that such intent to commit the underlying felony existed before, or concurrent with, the act of killing is a question of fact to be decided by the jury after consideration of all the facts and circumstances." *Id.* (citing *Hall v. State*, 490 S.W.2d 495, 496 (Tenn.1973); *State v. Holland*, 860 S.W.2d 53, 59 (Tenn.Crim. App.1993)). "[A] jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing." *Id.* at 108. The appellant contends that the evidence is insufficient to support his convictions for first degree felony murder committed during the perpetration of arson and theft because the State failed to establish that he formed an intent to commit the underlying felonies prior to or during the commission of the victim's murder. Again, we disagree.

Regarding the conviction for the felony murder committed during the perpetration of arson, the proof showed that the appellant learned Charlie Sims believed the owner of Nunley's fruit stand burned down Sims' fruit stand. Several weeks before the victim's death, the appellant suggested to Carl Hankins that they should burn down Nunley's. Gasoline was identified on the appellant's clothing, on the boots he was seen throwing over the balcony of Chattin's house hours after the murder, and in a soil sample taken from underneath a truck parked at the crime scene. As the appellant was describing the night's events to Chattin soon after the shooting, the appellant told Chattin that "Charlie [Sims] had to hear about this." Moreover, the appellant told Chattin that he had tried to burn down the stand but that it would not burn. The jury reasonably could have inferred that the appellant went

to Nunley's intending to burn down the fruit stand and killed the victim after being discovered.

With respect to the conviction for the felony murder committed in the perpetration of a theft, the jury heard testimony that the appellant previously had expressed an interest in obtaining a bulletproof vest. After killing the victim, the appellant took the victim's gun and part of the victim's bulletproof vest back to Chattin's house. He then complained to Chattin that he "had wanted a whole vest," not part of one. We conclude that the jury reasonably could have inferred that upon being discovered trying to burn the fruit stand, the appellant formed the intent to kill the victim and take his vest. The evidence is sufficient to support appellant's convictions.

F. Appellant's Statements to Witnesses

Next, the appellant contends that the trial court erred by allowing three witnesses, Malcolm Headley, Carl Hankins, and Mike Anderson, to testify about statements the appellant made to them about his purported hostility toward the police. He asserts that the real purpose for the statements was to portray him as a "cophater" who acted in conformity with this character trait. He concludes that the evidence was inadmissible under Tennessee Rule of Evidence 404(b) and was unduly prejudicial. The State responds that the appellant's statements were relevant to show his state of mind and his motive to kill the victim and were properly admitted. We conclude that the appellant waived this issue with regard to Headley and Anderson and that he is not entitled to plain error relief. As to Hankins' testimony, we conclude that the appellant's statements were relevant and not unduly prejudicial.

At trial, Malcolm Headley testified that he met the appellant while working as a security guard at Dole Fresh Fruits in Gulfport, Mississippi in 1999. Headley said the appellant visited with him and was particularly interested in Headley's military background as a sniper in the Marine Corps. Headley said he had declined the appellant's request to buy a bulletproof vest for the appellant and initially told the appellant that he was not interest in selling him a gun. Headley said that a few months later, he decided to buy a different gun and sold the appellant his old gun, an MAK–90 semiautomatic assault rifle. Asked whether the appellant had expressed any feelings toward law enforcement or the police, Headley said the appellant "had mentioned that he had had trouble with some law officers" and was "trying to get the thing settled." Headley said he understood that the matter "was supposed to go to trial or had a lawyer working on it." Headley said that sometime in 2000, the appellant telephoned him and asked Headley to meet him at a truck stop. There, the appellant told Headley that he was "going to take care of this problem he was having and would see me later." Headley continued as follows:

> Marlon told me that he was going—I said, "You going up there to court and all?"
>
> And he said, "Well, yeah, and if I could kill somebody, I will, even if I have to sneak up on them and do it."
>
> And I looked at him kind of funny and he was just, "Oh, I'm just joking."

Carl Hankins testified that he became acquainted with the appellant through their mutual friend, Mike Chattin, about three years before the trial. Hankins said that he had been around the appellant on four to six occasions and that the appellant had expressed to him that he "very much disliked the police department, any police

officers as far as that goes." Hankins said that at another time, the appellant stated that "he would kill a man before he would ever take a beating like he took before." Hankins could not recall when the appellant made this statement, but he said it was made in the context of discussing police officers and a prior beating the appellant had sustained.

Finally, the defense called Attorney Mike Anderson to the stand. In testifying to a pending civil lawsuit that the appellant had filed against the Chattanooga Police Department and three of its officers, Anderson was asked to read the appellant's answer to an interrogatory. Among several paragraphs detailing his claimed financial, mental, and physical damages, the appellant said, "I've grown to despise the police and feel that they are crooked."

Generally, a party may not introduce evidence of an individual's character or a particular character trait in order to prove that the individual acted in conformity with that character or trait at a certain time. Tenn. R. Evid. 404(a). In other words, a party may not use character evidence to show that a person acted in a particular way because he or she had a propensity to do so. *State v. Moore*, 6 S.W.3d 235, 239 (Tenn.1999); *State v. Parton*, 694 S.W.2d 299, 304 (Tenn.1985) (observing that evidence of another crime is not admissible to show that the defendant is the kind of person who would tend to commit the offense); *State v. Tizard*, 897 S.W.2d 732, 743 (Tenn.Crim.App.1994) (noting that character evidence may not be used to show a propensity to act). Similarly, evidence "of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b).

However, such evidence may be admitted for other purposes if relevant to some matter actually at issue in the case and if its probative value is not outweighed by the danger of its prejudicial effect. Tenn. R. Evid. 404(b); *State v. Wyrick*, 62 S.W.3d 751, 771 (Tenn.Crim.App.2001). Issues to which such evidence may be relevant include identity, motive, common scheme or plan, intent, or the rebuttal of accident or mistake defenses. Tenn. R. Evid. 404(b), Advisory Commission Comments; *Parton*, 694 S.W.2d at 302. Admissibility of other crimes, wrongs, or acts is also contingent upon the trial court finding by clear and convincing evidence that the prior crime, wrong, or act was actually committed. Tenn. R. Evid. 404(b); *Wyrick*, 62 S.W.3d at 771. The jury may consider evidence admitted under 404(b) as substantive evidence at trial. *Wyrick*, 62 S.W.3d at 771.

Before the trial court may permit evidence of a prior crime, wrong, or act, the following procedures must be met:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Provided that the trial court has complied with these procedures, this court will not overturn the trial court's decision to admit or exclude evidence under Rule 404(b) absent an abuse of discretion. *State v. DuBose*, 953 S.W.2d

649, 652 (Tenn.1997). "However, in view of the strict procedural requirements of Rule 404(b), the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." *Id.*

### 1. Appellant's Statements to Headley

The record reflects that the appellant filed a pretrial motion in limine to prohibit Headley's testimony "regarding the sale of an AK 47" rifle to the appellant "or any other hearsay statement, impression, or testimony on the grounds that such testimony would violate Rules 402, 403, 404(a)(b) and not come within any hearsay exception listed in Rule 803 of the Tennessee Rules of Evidence." The trial court deferred ruling on the motion until trial. Just prior to Headley's taking the stand, the defense reminded the court of its pending motion and requested that any testimony regarding the sale of the murder weapon and "some other discussions about ammunition, books, how to make bombs and so forth" be excluded as irrelevant because the statements had been made two years before the murder. In a bench conference, the State said it intended to question Headley about the appellant's attempt to buy a bulletproof vest from him and about the appellant's statement to Headley that the appellant "had to go back, he was having trouble with some policeman, or something to that effect." The trial court concluded that the evidence was "relevant and probative." The following exchange then occurred:

[The State]: Kiser told [Headley] that he was going back to Tennessee to take care of his problems there, that he would kill someone if he had to, that he would sneak up on someone and kill them if he had to. At that time he had his case pending here in Your Honor's court against the State, where he was charged with assault. And he had also filed this federal police brutality lawsuit and the court may want to limit that, but I think that—

THE COURT: Are you trying to get into all that?

[The State]: No, all I'm going to get into is he made the statement he was coming back to take care of problems and he'd kill somebody if he had to.

[The Defense]: Well, if they're going to ask if he was back here to take care of his problems, we want to ask if he had talked to him about, not the details of it, but the fact that he had a lawsuit pending up here.

[The State]: I wouldn't object to that.

[The Defense]: Well, I think that's only fair. It will give the wrong impression.

. . . .

[The State]: Let me say this, Judge, I don't think [Headley] knows any details about the lawsuit. I do intend to ask him if Mr. Kiser ever expressed any feelings about the police to him related to what his attitude was about the place, and I think he will say, Well, he didn't like the police, he said they were causing all kinds of problems, that kind of thing.

[The Defense]: And, of course, then we want to bring up the fact that he had filed a lawsuit against them.

The State contends that the appellant has waived any complaint to Headley's testimony because he failed to object specifically to the statements at issue. We agree. The appellant initially objected to Headley's testifying that the appellant sold him a gun, but he never objected to Headley's statements about the appellant's animosity toward the police. Even when the State announced that it was going to ask Headley about the appellant's statements, the defense failed to object or express any

concern about that line of questioning. *See* Tenn. R. Evid. 103(a)(1). Therefore, the appellant has waived the issue. *See* Tenn. R.App. P. 36(a) (providing that our rules do not require "relief [to] be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error").

As we explained previously, this court may analyze any error under the plain error doctrine. *See* Tenn R. Evid. 103(d). However, given the strength of the State's case, we conclude that consideration of the error does not does not meet the test for plain error review.

### 2. Appellant's Statements to Carl Hankins

The record reflects that during Carl Hankins' testimony, the State asked him if he had ever heard the appellant express his feelings about the police. Hankins said, "He very much disliked the police department, any police officers as far as that goes." The defense objected, stating only that "we object to that." The trial court sustained the objection as to the last part of Hankins' answer, saying that the last part of the answer "was just kind of thrown in. It wasn't in response to your question. He answered your question, then he added something else there at the end." The State's questioning of Hankins resumed, and the State began asking him about what occurred at Mike Chattin's house on the evening of May 5. Shortly thereafter, the State asked for a jury-out hearing. The State informed the trial court that Hankins "simply [is] not saying what he said three days ago and we'd like to kind of question him, I guess outside the presence of the jury, cross-examine him I guess, as a hostile witness." During the jury-out hearing, Hankins stated that the appellant said he would kill a man before "he'd let him take him back to jail," that the appellant was suing the city for police brutality, and that the appellant said "he would never let them beat him up again." The defense objected, arguing that the appellant's statements to Hankins were irrelevant and highly prejudicial. The trial court ruled that the appellant's statements were relevant to his attitude toward law enforcement officers.

The appellant contends that Hankins' statements should have been excluded under Tennessee Rule of Evidence 404(b) because the statements were "introduced to show action in conformity with the character trait, that defendant was a 'cop-hater.'" He also argues that the statements should have been excluded because they occurred far in advance of the shooting. Regarding Hankins' statement that the appellant disliked the police department, we note that the appellant did not state the ground for his objection. *See* Tenn. R. Evid. 103(a)(1) (stating that "[i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground was not apparent from the context"). Moreover, the appellant never argued at trial that any of Hankins' testimony was inadmissible under Tennessee Rule of Evidence 404(b). A party is bound by the evidentiary theory argued to the trial court and may not change or add theories on appeal. *See State v. Banes*, 874 S.W.2d 73, 82 (Tenn. Crim.App.1993). Thus, this court may consider only the arguments presented to the trial court as to why the testimony should have been admitted into evidence. The appellant argued that Hankins' statements were inadmissible because they were irrelevant and too remote in time to the crime.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

In this case, the State revealed during opening statements that its theory of the case was that the appellant killed the victim "because he wanted to kill a police officer. . . . [B]ecause it made him feel good." We conclude that the appellant's general animosity toward the police was relevant to this theory. *See State v. Gentry*, 881 S.W.2d 1, 7 (Tenn.Crim.App.1993) (evidence that defendant held a grudge against Tennessee Valley Authority (TVA) employees was relevant to show defendant killed a TVA employee who came onto his land); *State v. Frankie E. Casteel*, No. E1999–00076–CCA–R3–CD, 2001 WL 329538, at *12, 2001 LEXIS 248, at *36 (Knoxville, Apr. 5, 2001), *perm. to appeal denied*, (Tenn.2001) (defendant's general animosity toward trespassers was relevant to show his premeditation and motive to kill the victims); *State v. John Henry Wallen*, No. 03C01–9304–CR–00136, 1995 WL 702611, at *9, 1995 LEXIS 947, at *5 (Knoxville, Nov. 30, 1995) (evidence that defendant held a grudge against police officers in general was relevant to show he premeditated killing state police trooper). Moreover, although the evidence was prejudicial, we do not believe the probative value of the evidence substantially outweighed the danger of unfair prejudice. *See Gentry*, 881 S.W.2d at 7 (stating that

"the mere fact that evidence is particularly damaging does not make it unfairly prejudicial"). As to any argument regarding the remoteness of the statements, "remoteness affects only the weight, not the admissibility of the evidence." *State v. Smith*, 868 S.W.2d 561, 575 (Tenn.1993). Thus, the appellant is not entitled to relief.

3. Attorney Mike Anderson's Testimony

During the appellant's case-in-chief, the State asked that it be allowed to cross-examine Mike Anderson about the appellant's answer to an interrogatory question in the appellant's civil lawsuit against the Chattanooga Police Department. The State claimed that the answer, in which the appellant stated that he had grown to despise the police and believed they were crooked, was relevant to the appellant's motive and state of mind. The defense argued that it was only calling Anderson to the stand to testify as to the time of his scheduled appointment with the appellant and to show where the appellant was going when he left Mike Chattin's house on September 7. The defense stated that it was not going to question Anderson about the lawsuit and that "it would be inappropriate for the State to be allowed to just parse out the portion of the interrogatories." The trial court ruled that the appellant's answer in the interrogatories was relevant to the appellant's "state of mind of showing that he despised cops."

Once again, the appellant argues that such testimony is character evidence that is inadmissible under Tennessee Rules of Evidence 403 and 404. However, the appellant never raised such an argument at trial. As we explained with Carl Hankins' testimony, we conclude that the appellant's answer to the interrogatory question was relevant to the State's theory of the case. Therefore, the trial court properly con-

cluded that Anderson's testimony was admissible.

## I. Instruction on Reasonable Doubt

The appellant contends that he is entitled to a new trial because the jury instruction on reasonable doubt included "doubt that may arise from possibility." He contends that this inclusion "suggests an improperly high degree of doubt for acquittal and lowers the prosecution's burden of proof" but concedes that the Tennessee Supreme Court and the Sixth Circuit Court of Appeals have rejected past challenges to various similar formulations of the reasonable doubt instruction given here.

At the guilt phase of the trial, the jury was instructed on the concept of reasonable doubt as follows:

Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean a doubt that may arise from possibility. Absolute certainty is not demanded by the law, to convict of any criminal charge, but moral certainty is required, and this certainty is required as to every proposition of proof requisite to constitute the offense.

At the penalty phase, the trial court gave the jury an almost identical instruction on reasonable doubt.

In *State v. Bush,* 942 S.W.2d 489, 521 (Tenn.1997), the Tennessee Supreme Court upheld the use of the "moral certainty" language used together with the phrases "let the mind rest easily" and "arise from possibility" identical to the language of the instruction in the present case. The court in *Bush* observed that although "neither of these phrases have

been before the United States Supreme Court, the courts of this state have consistently upheld the constitutionality of this instruction." *Id.* (citing *State v. Nichols,* 877 S.W.2d 722 (Tenn.1994), *cert. denied,* 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995); *Pettyjohn v. State,* 885 S.W.2d 364 (Tenn.Crim.App.), *app. denied,* (Tenn. 1994); *State v. Christopher S. Beckham,* No. 2C01–9405–CR–00107, 1995 WL 568471, 1995 Tenn.Crim.App. LEXIS 799 (Jackson, Sept. 27, 1995); *Richard Caldwell v. State,* No. 02C01–9405–CR–00099, 1994 WL 716266, 1994 Tenn.Crim.App. LEXIS 85 (Jackson, Dec. 28, 1994), *perm. to appeal granted in part, denied in part,* (Tenn.1995); *State v. Victoria Voaden,* No. 01C01–9305–CC–00151, 1994 WL 714223, 1994 Tenn.Crim.App. LEXIS 845 (Nashville, Dec. 22, 1994), *perm. to appeal denied,* (Tenn.1995); *Harold V. Smith v. State,* No. 03C01–9312–CR–00393, 1994 WL 330132, 1994 Tenn.Crim.App. LEXIS 399 (Knoxville, July 1, 1994). The *Bush* court concluded that the challenged instruction did not violate the appellant's rights under either the United States Constitution or the Tennessee Constitution.

This court is bound to conclude that the reasonable doubt instruction in the appellant's case did not violate his due process rights. The appellant is not entitled to relief on this issue.

## L. Unanimous Jury Verdict Required for Life Sentence

The appellant asserts that requiring a jury to unanimously agree to a life sentence violates the Supreme Court's holdings in *Mills v. Maryland,* 486 U.S. 367, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). However, this argument has been repeatedly rejected. *See State v. Ivy,* 188 S.W.3d 132, 163 (Tenn.2006) (cit-

ing *State v. Brimmer*, 876 S.W.2d 75, 87 (Tenn.1994); *State v. Thompson*, 768 S.W.2d 239, 250 (Tenn.1989); *State v. King*, 718 S.W.2d 241, 249 (Tenn.1986), *superseded by statute as recognized by, State v. Hutchison*, 898 S.W.2d 161 (Tenn. 1994)).

## M. Failure to Include Aggravating Circumstance in Indictment

The appellant challenges our supreme court's interpretation of Tennessee Rule of Criminal Procedure 12.3(b) whereby a district attorney general may institute a capital murder prosecution by filing notice with no requirement that aggravating circumstances be charged in the indictment. *See e.g. State v. Hugueley*, 185 S.W.3d 356, 392–93 (Tenn.2006) (appendix). He asserts that the current interpretation of the rule violates his state and federal due process rights and the principles announced in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and its progeny and demands that he be granted a new trial.

Our supreme court has repeatedly rejected the appellant's argument that the State must charge the aggravating circumstances in the indictment, beginning with its decision in *State v. Dellinger*, 79 S.W.3d 458, 466–67 (Tenn.2002); *see also State v. Odom*, 137 S.W.3d 572, 591 (Tenn.2004); *State v. Holton*, 126 S.W.3d 845, 862–63 (Tenn.2004); *State v. Carter*, 114 S.W.3d 895, 910 n. 4 (Tenn.2003). On revisiting the issue, the court concluded that subsequent decisions extending and clarifying the application of *Apprendi* did not alter its holding in *Dellinger*. *See State v. Berry*, 141 S.W.3d 549, 559 (Tenn.2004). The appellant is not entitled to relief on this issue.

## N. Prosecutor Vested with Unlimited Discretion to Seek Death Penalty

The appellant argues that prosecutors' unlimited discretion in this state to decide whether to seek the death penalty in a first degree murder case causes the system as a whole to be arbitrary and capricious. Our supreme court has rejected this argument. *See State v. Hines*, 919 S.W.2d 573, 582 (Tenn.1995).

## O. Death Penalty imposed in a Discriminatory Manner

Next, the appellant contends that the death penalty is imposed in a discriminatory manner. More specifically, he cites various studies that he asserts reflect that the death penalty is imposed differently against capital murder defendants along racial, geographical, and gender lines. This claim has also been consistently rejected. *See Cazes*, 875 S.W.2d at 268; *State v. Smith*, 857 S.W.2d 1, 23 (Tenn. 1993).

## P. Cumulative Effect of Errors at Trial

The appellant argues that he was denied a fundamentally fair trial as a result of the cumulative effect of the errors at his trial. He focuses specifically on his claims of the erroneous admission of "propensity" or Rule 404(b) evidence against him and the exclusion of evidence that he contends pointed to Mike Chattin as the victim's killer. However, this court has concluded that the admission of Carl Hankins' and Mike Anderson's testimony about statements the appellant made proclaiming his hostility toward the police was not error and that any error regarding Malcolm Headley's testimony was harmless. We also concluded that the trial court's failure to give the residual doubt instruction was harmless. Given that no other errors exist, there is no "cumulative effect of er-

rors" to consider. The appellant is not entitled to relief.

### Q. Lack of Meaningful Proportionality Review of Death Sentence

The appellant claims that a lack of meaningful standards employed in the mandatory proportionality review of death sentences in this state effectively results in a system where nearly every death sentence will be deemed proportionate. Our supreme court has repeatedly upheld the comparative proportionality review undertaken by the appellate courts in this state as meeting state constitutional standards. *See State v. Vann,* 976 S.W.2d 93, 118 (Tenn.1998) (appendix); *State v. Keen,* 926 S.W.2d 727, 743–44 (Tenn.1994); *State v. Barber,* 753 S.W.2d 659, 663–668 (Tenn. 1988); *State v. Coleman,* 619 S.W.2d 112, 115–16 (Tenn.1981).